**In re III ENTERPRISES, INC. V, Debtor.**

**Bankruptcy No. 93–15932DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 3, 1994.

Frank J. Perch, III, Spector Gadon & Rosen, P.C., Philadelphia, PA, for debtor.

J. Gregg Miller, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Pueblo Chemical, Inc.

Robert T. Vance, Jr., Vance, Jackson, Simpson & Vance–Lewis, Philadelphia, PA, for United Bank.

Francis M. Correll, Jr., Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for First Executive Bank.

Walter J. Greenhalgh, Newark, NJ, for Citibank.

Ellen M. McDowell, Drinker Biddle & Reath, Philadelphia, PA, for RTC.

Frederic Baker, Philadelphia, PA, Ass't. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Presently before the court is the motion of III ENTERPRISES, INC. V ("the Debtor") requesting this court to find that no binding contracts exists, or, alternatively, to reject the purported executory contract ("the Motion"), between it and Pueblo Chemical, Inc. ("Pueblo"). Resolution of the Motion requires us to initially analyze and apply certain fundamental principles of contract law in order to determine if the alleged option or the "term sheet contract" that contains the option, which are the focus of the Motion, are valid, binding contracts which may be assumed or rejected by the Debtor pursuant to 11 U.S.C. § 365. We conclude that neither the alleged option nor the term sheet are, in fact, a valid contract and that, therefore, the Debtor need not reject either or both of them. In the alternative, we note that (1) the contract is not assumable under 11 U.S.C. § 365(c)(2); and (2) the Debtor's rejection of the contract would be permissible.

### B. FACTUAL AND PROCEDURAL HISTORY

The facts germane to this dispute, unless otherwise indicated, are not in dispute. The

Debtor filed a voluntary Chapter 11 bankruptcy case on October 8, 1993. Frank L. O'Brien, III, is the sole owner of III Enterprises, Inc., the parent and sole owner of the Debtor ("the Parent"). O'Brien is also a director and officer of O'Brien Environmental Energy, Inc. ("OEE"), a publicly traded Delaware corporation which is affiliated with the Parent. The Parent also filed a voluntary Chapter 11 bankruptcy case at Bankr. No. 93–15904DAS on October 7, 1993, and two other O'Brien-controlled entities, III Enterprises, Inc. I and Wyola Wheels, Inc., made similar filings on October 8, 1993, at Bankr. Nos. 93–15923DAS and 93–15924DAS, respectively. The only significant activities in any of these cases have been motions in the Parent's case for relief from the automatic stay by banks which made loans to the Parent, secured by OEE stock. The banks have either agreed or been ordered to abide their motions pending the filing of a Plan and Disclosure Statement by the Parent on January 28, 1994.

At some point in 1993, O'Brien began a search for financing because, according to the testimony of Pueblo's President, Elizabeth Sumerlin, at the hearing on the Motion on January 12, 1994, he needed funds to settle certain tax liabilities and bank debts. Pueblo and the Debtor were introduced during the first quarter of 1993, and thereupon began negotiations on a proposed loan from Pueblo to the Debtor. The parties agree that the Debtor was a "clean shell" created for the sole purpose of being designated as the recipient of the proposed loan. Its Schedules reflect that its only assets, in addition to "counterclaims" against Pueblo of "undetermined" value, is a $10 checking account balance, and its only debt, in addition to an "undetermined" claim of Pueblo against it, is a $75 obligation to an accounting firm for preparing a 1993 tax return.

The present controversy stems from the parties' negotiations, which culminated in a document entitled "Loan Term Sheet," dated July 30, 1993 ("the Term Sheet"). The initial draft of the Term Sheet was produced by O'Brien, although the final version is the product of negotiations between the parties. The loan contemplated by the Term Sheet was to be in the aggregate amount of $4.7 million and secured by 1.3 million shares of "OBS"[1] class B stock. Because of the Term Sheet's relative importance to the issues at hand, as well as its modest length, it is reproduced in full as follows:

### LOAN TERM SHEET
page 1 of 3 7/30/93 11:30

| | | |
|---|---|---|
| 1. | Lender | Pueblo Chemical, Inc. |
| 2. | Borrower | III Enterprises Inc. V. |
| 3. | Amount | Total of $4.7 million |
| | Drawdown A | $2 million, at closing |
| | Drawdown B | $2.7 million, 120 days after closing unless option set out in paragraph 7 below is exercised. |
| 4. | Collateral | |
| | Drawdown A | 500,000 shares, OEE "B" stock, and pledge of the equity of the OEE executive office building in Philadelphia, PA. |
| | Drawdown B | 800,000 shares, OEE "B" stock. The collateral posted for Drawdown A shall also cross collateralize Drawdown B. |
| 5. | Term | 24–months from Drawdown A |
| 6. | Interest rates and pre-payment | 7.50% annually; interest to accrue until maturity. Borrower may prepay the loan without penalty at any time, but any such prepayment shall not affect the option set out in paragraph 7. |

---

**1.** Although the term "OBS" is not defined in the Term Sheet, it is clear from the testimony of both parties' witnesses, as well as the parties' respective submissions to this court, that the stock offered as collateral was to be what we would preferably reference as "OEE" stock. We will therefore utilize our own abbreviation for O'Brien Environmental Energy, Inc., *i.e.,* "OEE," wherever the Term Sheet refers to "OBS."

7. Option to purchase

3,000,000 shares of OEE Class "B" @ $5.00 per share; amount due to be reduced at closing by principal and interest due from Borrower. Option to expire 24 months from the funding of Drawdown A.

LOAN TERM SHEET
page 2 of 3 7/30/93 11:30

8. Other conditions

Frank O'Brien shall continue to fulfill his fiduciary obligation to protect the interests of all O'Brien Shareholders, including the option interest held by Lender. Among these responsibilities shall be the non-dilution of existing equity and avoidance of major capital expenditures by O'Brien which are not in the ordinary and normal course of business.

9. Market sales by III Enterprises V/Frank O'Brien

Borrower shall give Lender 7 working days advance written notice of its intent to sell other shares of O'Brien Environmental Energy Stock. During said period, Lender shall have the right to purchase said stock on mutually acceptable terms. If no agreement has been reached between Borrower and Lender within said 7 working days, Borrower shall be free to sell the designated shares into the market.

10. Administrative matters

To be mutually agreed by Lender and Borrower

11. Assignment

The Lender may assign any or all of its rights, title, interest and obligations in and under this agreement at any time with the consent of Borrower, such consent not to be unreasonably withheld.

LOAN TERM SHEET
page 3 of 3 7/30/93 11:30

12. Closing Date As soon as possible but prior to August 10, 1993.

13. Transaction Costs and Documentation

Lender will be responsible for preparing required documentation. Each party will bear its own attorneys' costs.

AGREED AND ACCEPTED THIS ___[30]___ DAY OF JULY, 1993

PUEBLO CHEMICAL, INC.

By: ___X [E. Sumerlin]_____

Date: [July 30, 1993]_____

III ENTERPRISES, INC. V.

By: ___X [Frank L. O'Brien, III, Pres.]___

Date: _____

---

Of particular importance to Pueblo is paragraph 7 of the Term Sheet which, Pueblo alleges, grants it an immediately exercisable option to purchase 3 million shares of OEE Class B stock at $5.00/share ("the Option").

Shortly after the Term Sheet was executed by the parties, Pueblo prepared draft transaction documents, as contemplated by paragraph 13 of the Term Sheet, and delivered them to the Debtor on or about August 3, 1993 ("the Transaction Documents"). Among the Transaction Documents was a note, a mortgage, a security agreement, and an option agreement. The parties met on August 5, 1993, to negotiate the Transaction Documents in anticipation of the loan closing which, according to the Term Sheet, was to

occur on or before August 10, 1993. Despite a fairly lengthy meeting, involving not only the instant transaction but a proposal whereby OEE and Pueblo were considering a mutual investment in the Trans–Andean Pipeline ("TAP"), situated in Chile, the parties were unable to resolve all open issues and finalize the Transaction Documents. One of the unresolved issues was Pueblo's insistence, apparently for the first time, and not mentioned in the Term Sheet, of the inclusion of a personal guarantee from O'Brien. In an attempt to resolve these stumbling blocks, the parties' agents placed a substantial number of telephone calls to one another after the meeting. According to Sumerlin, it was at this point that Pueblo learned that the Debtor was "shopping the deal," and apparently did not intend to close the transaction with Pueblo.

Very shortly thereafter, on August 17, 1993, Pueblo commenced an action in the Delaware Chancery Court of New Castle County, captioned *Pueblo Chemical, Inc. v. III Enterprises, Inc. V and Frank L. O'Brien, III*, Civil Action No. 13080 ("the Delaware Action"), in which Pueblo sought (1) declaratory relief from the court regarding the existence and effect of the Option; and (2) an injunction to prevent the Debtor and O'Brien from either refusing to close the loan contemplated by the Term Sheet or from engaging in any negotiations or transactions with third parties which would compromise Pueblo's rights under the Option.[2]

Before the Delaware Action could proceed very far, the Debtor filed its Chapter 11

petition on October 8, 1993. Pueblo wasted no time filing, on October 19, 1993, a motion to dismiss the case or convert it to a case under Chapter 7. However, this motion was withdrawn by Pueblo on November 17, 1993.

The Debtor filed the Motion presently before us for resolution on November 15, 1993. In the Motion, the Debtor denied that the Term Sheet created a binding and enforceable contract between the parties. It also argued, in the alternative, that, even if the Term Sheet were a binding contract, it is executory and may be rejected pursuant to 11 U.S.C. § 365(a). The Motion was scheduled for a hearing on December 15, 1993. Pueblo filed a response to the Motion on December 14, 1993, appending thereto a "Cross-motion" for relief from the automatic stay ("the Cross Motion").[3]

Pueblo then filed its second motion to dismiss or convert this case to a Chapter 7 case on December 9, 1993 ("the Motion to Dismiss"). Pueblo requested that we schedule an expedited hearing on the Motion to Dismiss so that it might be heard at the same time as the Motion before us. Being concerned that a motion having such a profound effect on the Debtor's bankruptcy would be presented and determined too rapidly, we denied the request for expedited treatment, and the clerk scheduled a January 12, 1994, hearing on the Motion to Dismiss in the ordinary course. On December 15, 1993, at the request of the Debtor, the hearing on the Motion before us was continued to the same date as the hearing on the Motion to Dismiss,

---

**2.** The Debtor removed the Delaware Action to the United States Bankruptcy Court for the District of Delaware ("the DE Bankr.Ct.") in accordance with 28 U.S.C. § 1452(a). The Debtor has also filed a motion with the DE Bankr.Ct. to transfer the Delaware Action to this court. Meanwhile, Pueblo has filed a motion with the DE Bankr.Ct. seeking the remand of the Delaware Action, or in the alternative, requesting the court to abstain from hearing it in accordance with 28 U.S.C. § 1334(c). Both the Delaware Action and Pueblo's motion to remand would appear to be properly transferred to this court, the "home court" of the Debtor's bankruptcy, for determination. *See In re Convent Guardian Corp.*, 75 B.R. 346, 347 (Bankr.E.D.Pa.1987), and cases cited therein. We understand that the DE Bankr.Ct. intends to transfer the Delaware Action and Pueblo's motion to remand to this court. The instant resolution of the Motion be-

fore us may, of course, be *res judicata* of the merits of the Delaware Action.

**3.** We do not condone the use of "cross-motions." Their presentation results in a non-adherence to both Federal Rule of Bankruptcy Procedure 9014 and Local Bankruptcy Rule 9014.1, and an improper failure to provide any interested parties with requisite notice of a motion. *See In re Summit Airlines, Inc.*, 94 B.R. 367, 369 (Bankr. E.D.Pa.1988), *aff'd*, 102 B.R. 32 (E.D.Pa.1989). As a result of the improper procedural posture of the Cross Motion, our clerk's office never scheduled it for a hearing. As in *Summit Airlines*, 94 B.R. at 373, we will therefore proceed to summarily dismiss the Cross Motion as a procedural impropriety or nullity, without prejudice to Pueblo's refiling it in proper form. The disposition of the instant Motion may, of course, render it moot.

*i.e.,* January 12, 1994, on a must-be-heard basis. However, on the day of the hearing(s), Pueblo, as it had done in the case of its predecessor motion, withdrew the Motion to Dismiss.

We therefore found ourselves left with the Debtor's instant Motion and Pueblo's Cross Motion before us for resolution on January 12, 1994. Pueblo's only witness was its President, Sumerlin. After some scrambling to determine the whereabouts and availability of potential witnesses, the Debtor finally settled on Edward G. Fitzgerald, Esquire, its attorney during the loan negotiation stage, as its only witness. Upon completion of the hearing, the parties requested, and were granted, until January 24, 1994, to simultaneously submit Briefs on certain issues raised at the hearing supplemental to Briefs that they had filed before and on the date of the hearing. After being granted a two-day extension due to inclement weather, both parties filed their supplemental Briefs on January 26, 1994.

## C. DISCUSSION

### 1. THE DETERMINATION OF WHETHER THE PARTIES HAD A VALID, ENFORCEABLE CONTRACT IS AN ISSUE WHICH THE COURT MUST ADDRESS.

■ It is elementary to observe that, before the Debtor can assume or reject a contract, or, for that matter, before Pueblo can seek to enforce a contract, there must be a contract to assume, reject, or enforce. *See, e.g., In re CG Realty Investments, Inc.,* 79 B.R. 249, 253 (Bankr.E.D.Pa.1987) (party to purported contract has no rights under § 365 if no enforceable contract existed between the interested parties); *In re W.F. Martin Co.,* 66 B.R. 409, 411–13 (Bankr.E.D.Tenn. 1986) (debtor found not empowered to assume a contract which did not legally exist); 2 COLLIER ON BANKRUPTCY, ¶ 365.02, at 365–16 (15th ed. 1993) ("for section 365 to apply, the contract or lease must be in exis-

tence"). *Cf. In re Triangle Laboratories, Inc.,* 663 F.2d 463, 465–68 (3rd Cir.1981) (a lease contract containing an option which is terminated prior to bankruptcy cannot be assumed). We must, therefore, begin our analysis by answering the preliminary questions of whether the Term Sheet or the Option constitute binding, enforceable contracts between the parties.

Similarly, we must first address the issue of whether a valid contract exists before we can consider the issue of whether adequate consideration exists so as to render any purported contract enforceable. *In re GEM de Puerto Rico, Inc.,* 79 B.R. 142, 143–44 (D.P.R.1987) (a contract which lacked consideration was invalid and could not later be supplied with consideration or ratified by the bankruptcy court).

We therefore cannot accept Pueblo's argument, presented orally at the January 12, 1994, and in a footnote in its final Brief, that it is somehow inappropriate for us to consider the issue of whether the parties had a valid, enforceable contract in deciding the Motion. The issue of the existence and enforceability of the underlying contract are threshold issues the resolution of which is absolutely essential to the adjudication of the Motion.[4]

### 2. THE LAW OF DELAWARE MUST BE APPLIED TO DETERMINE WHETHER THE OPTION OR THE TERM SHEET CONSTITUTE VALID, ENFORCEABLE CONTRACT(S).

Whether the Term Sheet or the Option within it constitute a contract is a question of state law. To answer this question, we must first turn to the law of conflicts of the jurisdiction in which we sit, *i.e.,* Pennsylvania, in order to determine which state's law to apply. *See Jones & Laughlin Steel Corp. v. Johns–Manville Sales Corp.,* 626 F.2d 280, 283–84 (3rd Cir.1980); and *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1210 (3rd Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

---

4. The instant situation contrasts with that of *In re Orion Pictures Corp.,* 4 F.3d 1095 (2nd Cir.1993), where the bankruptcy court became embroiled in determination of the enforceable terms of the underlying contract in deciding a § 365(a) motion. The enforceability of the terms of a con-

tract is an issue which may properly be addressed after assumption or rejection occurs. However, assumption or rejection cannot occur at all if the parties do not have a valid, enforceable contract.

■ Courts sitting in Pennsylvania adhere to the so called "modern" rule regarding choice of law in the context of a contract dispute adopted by the Pennsylvania state courts. *See Jones & Laughlin, supra,* 626 F.2d at 284; *Neville Chemical, supra,* 422 F.2d at 1210–11; *Rhodes v. Superior Investigative Services, Inc.,* 437 F.Supp. 1012, 1016 n. 2 (E.D.Pa.1977); *Continental–Wirt Electronics Corp. v. Sprague Electric Co.,* 329 F.Supp. 959, 962–63 (E.D.Pa.1971); and *In re Windsor Communications Group, Inc.,* 80 B.R. 712, 722 (Bankr.E.D.Pa.1987), *aff'd in part & rev'd in part,* 96 B.R. 495 (E.D.Pa. 1989). This "modern" rule requires us to apply the law of the state which has the most significant relationship with the parties' contract, *i.e.,* the state in which the contract's "center of gravity" is located. We have similarly referred to this test as the "interest analysis/significant contracts" test. *Windsor Communications, supra,* 80 B.R. at 722, quoting *Jones & Laughlin, supra,* 626 F.2d at 284. *See also Neville Chemical, supra,* 422 F.2d at 1210–11; *Continental–Wirt, supra,* 329 F.Supp. at 963; and *Rhodes, supra,* 437 F.Supp. at 1016 n. 2. Factors such as where the contract was made and where it is to be performed help a court determine the interests and significant contacts which allow it to locate this "center of gravity." *Rhodes, supra,* 437 F.Supp. at 1016 n. 2; and *In re Estate of Danz,* 444 Pa. 411, 414, 283 A.2d 282, 284 (1971).

■ We have little difficulty concluding that the center of gravity of the contract here at issue, whether that contract is defined as the entire Term Sheet or the Option alone, is the State of Delaware. The Term Sheet was drafted and redrafted in Delaware. The Term Sheet contemplated a loan to a Delaware corporation secured by the stock of that Delaware corporation. Likewise, the Option involved the purchase of the stock of a Delaware corporation. The Term Sheet was executed by the Debtor in Delaware.[5] Finally, both parties tacitly acknowledge that Delaware law is properly applied by their citation to such law in their submissions to this court. We will therefore examine the law of Delaware in our attempt to determine if the Option or the Term Sheet constitute valid and enforceable contracts.

### 3. *NEITHER THE OPTION NOR THE TERM SHEET ARE VALID AND ENFORCEABLE CONTRACTS.*

a. *The Option Is Not a Valid, Enforceable Contract Because, Inter Alia, It Is Not Supported by Consideration.*

Pueblo is not totally clear about what it is it seeks to enforce as a binding contract. In a Brief of December 14, 1993, it states that, "[o]n or about July, 30, 1993, Pueblo Chemical, Inc.... and the Debtor entered into an agreement reflected in a Loan Term Sheet ... pursuant to which Debtor granted Pueblo an option to purchase 3,000,000 shares of Class B stock in O'Brien Environmental Energy, Inc...." Memorandum of Law in Support of Answer and Cross–Motion of Pueblo Chemical, Inc., at 2. Thereafter, Pueblo refers to a "stock option agreement" apart from the Term Sheet. *Id.* This is consistent with the testimony of Sumerlin that the Option arose at the time that the parties executed the Term Sheet, not at the time when the loan contemplated by the Term Sheet would have been closed or funded. Thus, we will first determine if an independent option contract, supported by consideration, was formed by the parties.

■ As we noted in *CG Realty, supra,* 79 B.R. at 251–53, an option contract is essentially an enforceable promise not to re-

5. We are mindful that Pueblo, a Texas corporation, was the last party to execute the Term Sheet, and that it did so in Texas. We are also aware of certain older Pennsylvania cases which hold that a contract should be interpreted using the law of the state in which it was made, and that a contract is made in the state where the last necessary act to formulate it is performed. *See, e.g., Varas v. Crown Life Insurance Co.,* 204 Pa.Super. 176, 183, 203 A.2d 505, 509 (1964), *cert. denied,* 382 U.S. 827, 86 S.Ct. 62, 15 L.Ed.2d 72 (1965); and *Crawford v. Manhattan Life Ins. Co. of N.Y.,* 208 Pa.Super. 150, 154, 221 A.2d 877, 880 (1966). We believe, however, that Pennsylvania courts now apply the better rule of law discussed above. To adopt the "last act theory" would be to invite absurd results in the interest of creating a bright line test. Indeed, by applying such a rule to the situation at hand, we would be required to apply the law of the state of Texas, a state which has but a tangential interest in this controversy. We are confident that courts sitting in Pennsylvania can consistently apply the "modern" rule, thus preserving the expectations of the parties and arriving at logical conclusions.

voke an offer. *See also* 4 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS, § 5:15, at 710 (4th ed. 1990) (hereinafter cited as *"Williston "*) ("Defined at its most basic level, an option is simply a contract to keep an offer open."); RESTATEMENT (SECOND) OF CONTRACTS, § 25, at 73 (1979) (hereinafter cited as "Restatement") ("An option contract is a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer."). As such, it must satisfy the ordinary requirements of a valid contract, including the provision of adequate consideration to the parties chargeable therein. *See CG Realty,* 79 B.R. at 253; *Williston, supra,* § 5:16, at 722–24; E.A. FARNSWORTH, FARNSWORTH ON CONTRACTS, § 3.23, at 185–88 (2d ed. 1990) (hereinafter cited as *"Farnsworth "*); *Kahn v. General Development Corp.,* 40 Del.Ch. 83, 92, 174 A.2d 307, 312 (1961) (an option must be supported by "present consideration" in order to become irrevocable); *Gottlieb v. Heyden Chemical Corp.,* 33 Del.Ch. 283, 289, 92 A.2d 594, 597 (1952) ("[An option contract] must, of course, possess its own consideration.").[6]

■ It is clear that paragraph 7 of the Term Sheet, standing alone, does not form a binding option contract between the parties. There is no mutual expression of assent, *see* Restatement, § 87, cmt. b, at 229 ("In the absence of statute, however, the bargaining

form is essential...."), and several essential terms are not addressed. Specifically, we cannot determine the term of the Option. Paragraph 7 does limit the option to "24 months from the funding of Drawdown A," but, until there is in fact a drawdown, this phrase is meaningless. We can only conclude that the parties did not intend the Option to become effective until Debtor drew down on the loan offered by Pueblo, at which time the term of the Option could be determined and would begin to run. Any other conclusion would, as the Debtor points out, create an unlimited option in Pueblo's favor and render parts of paragraph 7 of the Term Sheet meaningless. *See Commercial Credit Co. v. Empire of America Relocation Services, Inc.,* 1987 WL 25483, slip op. at *4 (Del.Super.Ct. Nov. 17, 1987), *rev'd on other grounds,* 551 A.2d 433 (Del.1988) (it is a "well-established tenet of contract construction whereby provisions of a contract are harmonized where possible, 17 Am.Jur.2d, Contracts § 267 (1974)."). *Cf. Robinson v. Stover,* 320 Pa. 308, 315, 182 A. 145, 148 (1936) (clauses of a contract should be read in harmony, if possible) (construing Pennsylvania law).

■ Courts will strictly enforce term limitations contained in option contracts because to grant the optionee unbargained for time to speculate at optionor's expense would be inherently unfair.[7] *Cf. Farnsworth, supra,* § 8.7, at 597–98 (courts will strictly enforce the term of an option contract and will not excuse the late exercise of an option because "it would be unfair to allow the holder to

---

**6.** In *CG Realty, supra,* we noted that a failure of consideration was "not necessarily fatal to the validity of an option, but it does mean that the optionor can revoke the option at any time prior to acceptance." 79 B.R. at 253. This is consistent with the general contract principle that an offer without consideration may be revoked at any time *until acceptance,* at which time a binding contract is formed which is supported by the mutual promises of the parties. The law of Delaware is to the same effect. *See, e.g., Mobil Oil Corp. v. Wroten,* 303 A.2d 698, 700 (Del.Ch.1973), *aff'd,* 315 A.2d 728 (Del.1973) ("Although a gratuitous option may be revoked by the optionor at will, it constitutes a continuing offer to the optionee unless and until it is revoked."). It is clear that Pueblo has not accepted the Option. Whether acceptance is accomplished through tender of the stock purchase price or by a promise to tender the stock purchase price, *see, e.g., Estate of Messick,* 1989 WL 101866, 1989 Del.Ch. LEXIS 107, at *9–*14 (Del.Ch. Sept. 5, 1989), Sumerlin testified that, at the present time, Pueb-

lo is unwilling or unable to do either. Thus, if we determine that the Option is not supported by adequate consideration, then the Debtor is free to revoke its offer. Indeed, if the Option is not an irrevocable offer, then the Debtor has already revoked the Option by its clear intent not to contract with Pueblo.

> Just as the offeror need not say "offer" to offer, so too the offeror need not say "revoke" to revoke. It is enough that the offeror indicate an intention not to make the proposed contract. Action without words suffices if the action is inconsistent with an intention to make the contract.

*Farnsworth, supra,* at § 3.17, at 161–62.

**7.** For this reason, we will not supply the missing term, as courts sometimes will when the intent of the parties is clear or when the missing term is not essential. Here, the intended term of the Option is far from clear, although this term is certainly crucial to this or any option contract.

prolong this period by delay"); and Restatement, *supra*, § 87, cmt. b, at 229 ("[N]ominal consideration is regularly held sufficient to support a *short-time option* proposing an exchange on fair terms.") (emphasis added). If it is unclear to a court when an option is to become effective, if at all, it would be folly to second guess the parties' intentions by creating even a short-term option. *Cf. CG Realty, supra,* 79 B.R. at 252 (the ability of either party to unilaterally refuse to perform under the terms of an option contract provides a clear indication that neither party intends to be bound, eliminating the purported option as an enforceable contract which triggers rights under § 365).

■ Additionally, we find that no consideration has been provided by Pueblo to the Debtor for the Option. *See Mobil Oil, supra,* 303 A.2d at 700 ("There was no consideration for the option, because at that point [the optionee] was bound to nothing, had promised nothing, and had delivered nothing."). Although Pueblo asserts that the "loan commitment," i.e. the Term Sheet,[8] was given in exchange for the option, we are not convinced. First, there is nothing in the Term Sheet itself or in paragraph 7 which suggests that consideration had been given to and received by the Debtor in return for the Option. Even the Restatement, which recognizes valid option contracts even when the purported consideration is not actually given, requires that the "false" consideration be recited. Restatement, *supra*, § 87, cmt. c, at 230. Nowhere is it stated that the option was intended to be effective immediately, in return for Pueblo's "commitment."

We are also troubled by the timing of events if, as Pueblo contends, the Term Sheet was intended to serve as the consideration for the Option. If the Option was intended by the parties to become effective contemporaneously with the execution of the Term Sheet, it makes no sense to include the terms of the Option, without explanation, in the Term Sheet itself, which otherwise describes events which are to take place on or

after a closing to be conducted in the future. It would seem more logical for the parties to have at least described the Option-for-commitment transaction in a separate document or letter which would have preceded the execution of the Term Sheet if they intended for it to be a separate enforceable obligation unto itself. At the very least, it seems reasonable that Pueblo would have insisted on inserting some language in paragraph 7 which would tie the effective date of the Option to the execution of the Term Sheet. Instead, the language of paragraph 7 suggests that the Option was not to become effective, if at all, until the closing and the first drawdown of the proposed loan. *Cf. Commercial Credit, supra,* 1987 WL 25483, slip op. at *4; and *Robinson, supra,* 320 Pa. at 315, 182 A. at 148.

Our conclusions are not unlike those reached by the court in *In re Wilhoit,* 69 B.R. 365 (Bankr.M.D.Fla.1987). In that case, the debtors purchased a parcel of land and, as part of the same transaction, purportedly granted the seller's son a 15–year option to purchase a small portion of the parcel if the main parcel were ever subdivided or sold within the term of the option. *Id.* at 366. The consideration for the option was designated as $10.00, although, as the court noted, "there is no evidence in this record that the sum was, in fact, ever paid to the Debtors." *Id.* At some point, the debtors decided to sell the parcel and notified the optionee of their intentions. *Id.* The optionee sent a letter to the debtors indicating his desire to exercise his option, but, like Pueblo in this case, the optionee never tendered the purchase price or even indicated his willingness to proceed to a closing. *Id.* Of course, no sale was ever consummated and, after the debtors filed their bankruptcy, the optionee sued them in bankruptcy court seeking damages as a result of the debtors' refusal to honor the option. *Id.*

The bankruptcy court began its analysis in much the same way as we did here, *i.e.,* by reviewing the applicable state law and concluding that "[a]bsent a valid consideration,

---

**8.** Nor is it clear that the Term Sheet was a "loan commitment" in the traditional sense, although both parties referred to it as such, and Pueblo's testimony that the Debtor used the Term Sheet as a commitment letter went unchallenged. The document is, however, titled "Term Sheet," not "Loan Commitment." *Cf. Pantzer v. Shields Development Co.,* 660 F.Supp. 56, 59 (D.Del.1986)

("[T]he letters are designated 'letter of intent' rather than a contract."). Thus, it is logical to assume that the document is nothing more than a list of terms to be incorporated in subsequent documentation. Furthermore, the Term Sheet was drafted by O'Brien, the borrower, and not by Pueblo, the proposed lender. Customarily, it is the lender who drafts and issues a commitment.

[an option] is nothing more than an offer which may be withdrawn by the offeror before acceptance." *Id.* at 367. Although the court acknowledged that even nominal consideration may be sufficient to support an option, no evidence was presented which indicated that the $10.00 nominal sum referenced in the option's recitals was, in fact, paid. *Id.* In the absence of such evidence, the court concluded that "it is fair to infer that [the stated consideration] was not paid." *Id.*[9] The court concluded that the debtors received no "benefit" from optionee, nor did the optionee suffer any "detriment" which would constitute adequate consideration. *Id.* at 368. Therefore, the bankruptcy court disallowed the optionee's claim. *Id.*

■ Because we are unable to conclude that any independent consideration was given by Pueblo for the Option,[10] we hold that the parties did not enter into a valid option contract independent from the Term Sheet. In light of this holding, we must now determine if the Term Sheet as a whole is an enforceable contract through which Pueblo may seek to enforce the Option.

b. *The Term Sheet Is Not a Valid, Enforceable Contract Because, Inter Alia, It Is Nothing More than an Interim Agreement in Aid of Preliminary Negotiations to Which the Parties Could Not Have Reasonably Expected to Have Been Bound.*

■ An option contained in a contract may be sustained by "bootstrapping" the consideration given by the offeror for the contract as a whole into its option portion. *Williston, supra,* § 5:16, at 724 ("The consideration may be a term of another contract and can at the same time support the option contained in the contract.") *See also, id.,* § 7.49, at 765 (one consideration may support several promises). *See also Miller v. Super Seal Container Corp.,* 62 F.Supp. 578, 579 (D.D.C.1945) ("It is not necessary that there be a separate consideration for each item of a series of agreements, which were treated by the parties as one. A single consideration suffices for all of them."). If the Term Sheet itself is a binding contract supported by adequate consideration, then it may be argued that the Option contained within it is also valid and supported by the same consideration.

■ The Term Sheet, unlike the Option, does contain what appears to be a mutual exchange of consideration. Specifically, Pueblo agreed to loan money to the Debtor in exchange for the Debtor's agreement to repay the loan and extend to Pueblo the Option to purchase the class B stock of OEE. The proposed loan, however, was never consummated. Thus, we must determine whether the parties' failure to close the loan undermines the consideration supporting the agreement embodied in the Term Sheet.

9. If Florida, the state under the law of which *Wilhoit* was decided, had adopted the Restatement's position on consideration for option contracts, it is possible that the court could have concluded that the $10.00 consideration recited in the option contract, even if false, was sufficient to bind the parties. *See* Restatement, *supra,* § 87(1)(a), at 228. We are not faced with such a dilemma here because, as noted above, there was no recital of consideration vis-à-vis the Option contained in the Term Sheet or in any other document made a part of the record.

10. Sumerlin also testified that Pueblo was subjected to a certain amount of expense and trouble to investigate OEE and to look into funding sources with the eventual exercise of the option in mind. Although a "detriment" on the part of a party to a contract may constitute consideration, the costs incurred in performing such "due diligence" by an optionee are not generally considered such a "detriment" as would make an option contract binding. *Williston, supra,* § 5:15, at 715–16 ("Unless the offeree's detrimental reliance is sufficient to justify invocation of promissory estoppel, . . . the mere fact that an offeree incurs a detriment by expending time or money in investigating the offer is not sufficient to make it irrevocable, since the detriment incurred was not requested by the offeror in return for a promise on his part.") (footnote omitted); and *Farnsworth, supra,* § 3.23, at 186–87. In this regard, we note that Sumerlin testified that Pueblo only engaged in minimal due diligence and that it intended to perform the bulk of its due diligence during the term of the Option. Moreover, its funding search began "before the closing of the loan term sheet," suggesting that Pueblo's efforts were, indeed, not bargained for consideration. In any event, this search consisted of informal conversations with brokerage houses and other sources who were already acquainted with Pueblo and did not include requests for financial information. Significantly, none of these contacts ever progressed so far as to result in the issuance of a commitment letter. Ironically, Sumerlin testified that some of the funding sources expressed "concern" over how Pueblo would "protect" the Option over its term.

We are greatly assisted at this point in our analysis by the reasoning of *Kahn, supra,* a case with facts which parallel the present controversy. In that case, General Development Corp. ("General") began to experience financial difficulties and found itself in need of additional working capital. 40 Del.Ch. at 85, 174 A.2d at 308. General explored various funding sources and eventually struck a deal with Bellanca Aircraft Corp. ("Bellanca"). *Id.* General and Bellanca entered an escrow agreement which contained a five-year option in Bellanca's favor. Pursuant to the option, Bellanca could exchange 4000 shares of its own stock in return for all of General's stock. General's stock would be held in escrow for the term of the option, or until Bellanca exercised the option. The escrow agreement also permitted Bellanca to control General's board of directors, thus giving Bellanca voting control of General. In return, Bellanca agreed to pledge sufficient collateral to Equitable Trust Company ("Equitable") in order to establish an interest-free, $150,000 line of credit for General's use. 40 Del.Ch. at 85–86, 174 A.2d at 308.

From the start, Bellanca's performance varied from the terms of the escrow agreement. Rather than supply sufficient collateral to Equitable to support a $150,000 line of credit, Bellanca only provided as much collateral as was necessary to cover General's current outstanding balance on the line, which never approached the full $150,000. Thus, when the pledged collateral declined in value (the collateral was shares of stock in an unrelated company), Equitable found itself undersecured, and it refused to accept the shares as collateral. 40 Del.Ch. at 87, 174 A.2d at 309. Bellanca liquidated the collateral and, with additional funds equal to the undersecured portion of the Equitable loan, it paid off the line of credit. Bellanca notified General that, from that point forward, Bellanca would lend the funds necessary to cover General's working capital needs directly to General. 40 Del.Ch. at 87–88, 174 A.2d at 309. Although Bellanca did lend General funds totalling about $20,000 at the outset, it stopped advancing funds three months later. As a result, General experienced critical cash shortages and was forced to secure expensive short term financing. 40 Del.Ch. at 88–89,

174 A.2d at 309–10. This prompted certain shareholders of General to instruct the escrow agents not to honor the option should Bellanca attempt to exercise it. Not surprisingly, Bellanca did attempt to exercise the option, and the escrow agents filed an interpleader action with the Delaware Court of Chancery to prevent it from doing so. 40 Del.Ch. at 89, 174 A.2d at 310.

The court quite easily concluded that Bellanca had breached the escrow agreement, noting that Bellanca was required to establish an interest-free line of credit with Equitable in General's favor, and that, without General's consent, Bellanca had modified this arrangement. 40 Del.Ch. at 91, 174 A.2d at 311. Next, after noting that a valid option contract must be supported by consideration, the court thusly explained, 40 Del.Ch. at 92, 174 A.2d at 312, how Bellanca's breach effected the option:

[t]he consideration supplied by Bellanca to make the option irrevocable for a fixed period was its promise to establish and maintain a line of credit for General with Equitable. The failure of Bellanca to fulfill this obligation thus amounted to a failure of consideration and destroyed the irrevocability of the option. The depositing stockholders were thus free to revoke their offer, it no longer being made irrevocable by present consideration. This, they did. . . .

As in the *Kahn* case, the consideration supplied by Pueblo to the Debtor was a loan which never occurred. Of course, if Debtor had made it impossible for Pueblo to complete any of its contract commitments, then Pueblo's nonperformance may have been excused. *See T.B. Cartmell Paint & Glass Co. v. Cartmell,* 37 Del. 528, 543, 186 A. 897, 903 (Del.Super.1936) (" 'It is a sound principle that he who prevents a thing being done shall not avail himself of the non-performance he has occasioned,' " quoting *Fleming v. Gilbert,* 3 Johns. (N.Y.) 528, 531 (1808)). We cannot conclude on this record, however, that Debtor was responsible for the failure of the proposed loan to close by August 10, 1993, the deadline established in the Term Sheet. We heard uncontroverted testimony that several issues were unresolved in the

minds of both parties, and that both Pueblo and the Debtor were undecided on several issues at the August 5, 1993, meeting and thereafter. Moreover, on cross-examination, Sumerlin acknowledged that her information regarding the Debtor's unwillingness to consummate the loan transaction was hearsay which did not come from the Debtor or the Debtor's counsel. There was clearly no proof that Pueblo was ready to close on August 10, 1993, and that Debtor unilaterally refused to do so. We must therefore conclude that, as in the *Kahn* case, there has been a failure of consideration which allows the Debtor to revoke the Term Sheet contract.

Moreover, we are not convinced that the Term Sheet was anything but an aid to preliminary negotiations. *See* Restatement, *supra*, § 26, at 75 ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."); and *Leeds v. First Allied Connecticut Corp.,* 521 A.2d 1095, 1102 (Del.Ch.1986) ("Agreements made along the way to a completed negotiation, even when reduced to writing, must necessarily be treated as provisional and tentative."). *See also Pantzer, supra,* 660 F.Supp. at 59–60; and Restatement, *supra,* § 27, at 78. Of course, two parties can agree to make a contract, and that contract to make an agreement can be enforced if the contract to make an agreement contains all of the essential terms that were to be incorporated into that contract. *See Vale v. Atlantic Coast & Inland Corp.,* 34 Del.Ch. 50, 55, 99 A.2d 396, 399 (1953). The Term Sheet, however, does not contain many material terms commonly found in a loan agreement. *See Pantzer,* 660 F.Supp. at

59–60 ("there can be no contract when an *essential* term is missing") (emphasis in original). The missing terms essential to the instant contractual relationship include a repayment schedule, representations and covenants, events of default, and remedies upon default. The Term Sheet expressly states that the parties contemplate further negotiations regarding "administrative matters." Indeed, Pueblo itself engaged in further negotiations after the execution of the Term Sheet regarding a guaranty from O'Brien and, according to the Debtor's witness Fitzgerald, a non-competition agreement as well. Neither of these items is addressed in the Term Sheet, although they can hardly be termed "administrative matters." [11] Finally, the Term Sheet provided for future documentation to be provided by Pueblo.[12] This is not surprising, as we find it implausible that Pueblo would be willing to make a $4.7 million loan based on the strength of a two and a half page Term Sheet which was drafted by the Debtor. All these factors, when weighed together, indicate that the parties did not intend the Term Sheet to be the embodiment of their final agreement.

Again, we find support for our conclusions in Delaware case law. In *Leeds, supra,* the owner of a 150 bed convalescent center ("the Center"), Leeds, placed an advertisement in two national publications seeking offers to purchase the Center. *Id.* at 1098. An agent of First Allied Connecticut Corp. ("First Allied") saw the advertisement, responded, and began negotiations with Leeds. *Id.* Leeds and the agent had several telephone conversations in which they negotiated such terms as selling price, down money, and financing. Once the agent succeeded in negotiating a sufficiently low purchase price, Glazer, the owner of First Allied, took over the negotiations. *Id.* Glazer called Leeds and informed

---

**11.** The fact that Pueblo eventually relented on its request for a non-compete agreement is not significant. More significant is the fact that Pueblo felt free to ask for this and other concessions from the Debtor after the execution of the Term Sheet.

**12.** According to § 27 of the Restatement, *supra,* at 78, "[m]anifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact

that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations." We believe that the circumstances of this case show that the Term Sheet was produced in furtherance of preliminary negotiations. In any event, the Term Sheet lacks several essential terms which would prevent it from being "sufficient to conclude a contract."

him that he was interested in purchasing the Center for $3.5 million, but only wanted to put down $500,000 in cash and finance the rest. *Id.* The parties compromised on a $600,000 figure and, according to Leeds, Glazer promised to send out a "letter of intent" consistent therewith. *Id.* Glazer testified, however, that Leeds indicated that he would agree to sell the Center on the terms discussed, and that Glazer offered to put a contract in the mail. *Id.* at 1098–99. In any event, a letter containing the basic terms of the agreement was sent by Glazer to Leeds ("the Term Letter"), who was asked to "advise if the above will be acceptable to you." *Id.* at 1099. Leeds "accepted" the Term Letter by signing it and returning it to First Allied. *Id.*

After his conversation with Glazer, but before "accepting" the Term Letter, Leeds drafted a letter to Glazer outlining additional terms and noting that the $3.5 million selling price was possible only because of the availability of certain tax-free bond financing which Leeds preferred. This letter was never sent to Glazer nor First Allied. *Id.* at 1099–1100.

In apparent reliance on the Term Letter, Glazer convened the board of the corporate shell he had formed to purchase the Center ("the Buyer"), and adopted resolutions approving the Term Letter. *Id.* at 1100. At this time, no representative of the Buyer had inspected, or even seen, the Center. After Glazer finally inspected the Center, the parties discussed documentation and set up a meeting to draft transaction documents. *Id.* Leeds hired an attorney to attend the documentation meeting. *Id.* The meeting did not go well; the parties "could agree on virtually nothing." *Id.* at 1101. Moreover, the parties' relationship so far deteriorated over the course of the meeting that, by its conclusion, Leeds had decided to himself that he did not want to enter into any sort of transaction with Glazer. *Id.* About a month after the documentation meeting, Leeds finally informed Glazer that the deal was off. Glazer responded by filing the Term Letter of record, claiming that it was a binding contract for the sale of the Center. *Id.* Leeds, who had subsequently found a pur-

chaser willing to buy the Center on his terms, sued First Allied to remove the cloud of its claim on the title to the Center. *Id.*

The central issue presented to the court was whether the Term Letter constituted a binding contract between the parties. The court quite properly recognized that its inquiry was "an 'objective' one: whether a reasonable man would, based upon the 'objective manifestation of assent' and all of the surrounding circumstances, conclude that the parties intended to be bound by contract." *Id.*

> Until it is reasonable to conclude, in light of all these surrounding circumstances, that all of the points that the parties themselves regard as essential have been expressly ... resolved, the parties have not finished their negotiations and have not formed a contract. Agreements along the way to a completed negotiation, even when reduced to writing, must necessarily be treated as provisional and tentative. Negotiation of complex, multi-faceted commercial transactions could hardly proceed in any other way.

*Id.* at 1101–02.

The court noted that the Term Letter did contain certain essential terms such as purchase price, principal amount of note, term of note, and interest rate. *Id.* at 1102. However, the court concluded that Glazer could not have reasonably believed that the negotiation had concluded in light of the unresolved tax-free financing issue which was so important to Leeds. *Id.* Furthermore, the court noted that,

> while it is surely possible to make a binding contract to sell a $3.5 million business, including real estate, on a single page, it would be extraordinary to do so.... [P]utting aside the question of the impact on the transaction of having [tax-free] financing available, there are myriad topics and terms utterly conventional when a commercial seller takes back a note—such as financial covenants ...; warranties concerning the financial condition and due organization of the maker of the note; and terms defining and governing defaults and cures of default. There is no legal requirement that these topics be dealt with before

negotiations resulting in agreements may be regarded as having concluded in a contract. But, unless there is some affirmative basis to suppose that the parties actually intended to pass over such points, a reasonable negotiator in a transaction of this size and type would not be justified in concluding that such was the unexpressed intention.

*Id.* at 1102–03. Thus, the court concluded that the parties did not intend to bind themselves by the Term Letter. *Id.* at 1103.

The Term Sheet in issue shares many striking similarities with the Term Letter in *Leeds.* And, like the *Leeds* court, we conclude that the instant parties did not intend to be bound by the Term Sheet. We will therefore grant the Debtor's Motion insofar as it requests a finding that there is no valid contract between the parties to assume.

4. *EVEN IF WE WERE TO ASSUME, ARGUENDO, THAT THE TERM SHEET AND/OR THE OPTION WERE VALID, ENFORCEABLE CONTRACTS, THE DEBTOR WOULD BE PROHIBITED FROM ASSUMING THE TERM SHEET AND PERMITTED TO REJECT THE OPTION BECAUSE IT WOULD CONSTITUTE A CONTRACT TO MAKE A LOAN, PURSUANT TO 11 U.S.C. § 365(c)(2).*

 Even were we to assume, *arguendo*, that the Term Sheet were a valid contract, we do not think that Debtor could assume it, even if it wanted to, as a result of the prohibition contained in 11 U.S.C. § 365(c)(2). That Code section provides, in pertinent part, that "[t]he trustee [or debtor-in-possession] may not assume … any executory contract … if … such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, …" The parties dispute the effect of this provision when the putative lender has waived, or agrees to waive, the prohibition set forth therein. The Debtor argues that 11 U.S.C. § 365(c)(2) is intended to protect more than just the putative lender and, therefore, the provision cannot be waived by the lender's action alone.

Pueblo, on the other hand, argues that the prospective lender's waiver of 11 U.S.C. § 365(c)(2) is sufficient.

We need not settle this dispute. Whether the putative lender can or cannot "waive" § 365(c)(2) is irrelevant if the Debtor is unwilling to assume the underlying contract. Our research has uncovered no cases which hold that a party to an executory contract can force the debtor to assume any such contract. *See, e.g., In re Sundial Asphalt Co., Inc.,* 147 B.R. 72, 80 (E.D.N.Y.1992) ("The Court finds nothing in [§ 365] or the Bankruptcy Rules providing for rejection or assumption of an executory contract by a party other than the trustee or debtor in possession, and finds no authorization for the court making such an election *sua sponte,* although whatever election is made by the trustee is subject to the court's approval."). Indeed, in the case principally relied upon by Pueblo on this point, *In re Easebe Enterprises, Inc.,* 900 F.2d 1417, 1418–19 (9th Cir. 1990), the debtor in possession *wanted* to assume the financial accommodation contract over the objection of the other party to the contract. *See also In re Prime, Inc.,* 15 B.R. 216, 218–19 (Bankr.W.D.Mo.1981) (*the debtor* can assume a contract for debt financing if the lender is willing). The *Easebe* debtor asserted that the party who promised to extend the financing should be estopped from arguing that the contract could not be assumed under § 365(c)(2) because that party had previously discussed with the debtor possible scenarios under which it would be willing to go forward under the contract. 900 F.2d at 1418–19, 1420–21. The Ninth Circuit concluded that a party could, by sleeping on its rights, miss its opportunity to raise § 365(c)(2) as a defense. *Id.* at 1420–21. But the court did *not* hold that a party could affirmatively waive § 365(c)(2) on behalf of all parties to the bankruptcy and then force the debtor to assume the contract at issue. There is no question in our mind that Pueblo's willingness to "waive" § 365(c)(2) is not determinative and is not even relevant in the face of Debtor's unwillingness to assume the Term Sheet.

Furthermore, if the Term Sheet does operate as a loan commitment, as Pueblo con-

tends, to allow the Debtor to assume the commitment, with or without the blessing of Pueblo, would undermine the careful balance between 11 U.S.C. § 365 and 11 U.S.C. § 364 governing post-petition financing. *See In re City Wide Press, Inc.*, 102 B.R. 431, 436 (Bankr.E.D.Pa.1989), *aff'd*, 110 B.R. 710 (E.D.Pa.1990) (§ 364 sets forth specific requirements which must be satisfied before a debtor may procure credit). We are not prepared to emasculate § 364 by adopting the unorthodox application of § 365(c)(2) urged by Pueblo.

5. *EVEN IF WE WERE TO ASSUME, ARGUENDO, THAT A VALID CONTRACT EXISTS AND THAT THE DEBTOR COULD ASSUME IT, THE DEBTOR HAS MET ITS RATHER LIGHT BURDEN FOR REJECTING SAME.*

Finally, if we again assume, *arguendo*, that the Option, independent from the rest of the Term Sheet, is a valid contract, we have no difficulty concluding that the Debtor can reject it. Of course, there is no Code section equivalent to § 365(c)(2) which prohibits the assumption of an option contract. Perhaps this is the reason Pueblo takes great pains to differentiate the Option from the Term Sheet.[13]

As we have stated in past decisions, we think it appropriate to interpret a debtor's right to assume or reject an executory contract under § 365 quite broadly. *In re W. & L. Associates, Inc.*, 71 B.R. 962, 963

(Bankr.E.D.Pa.1987); and *In re Metro Transportation Co.*, 87 B.R. 338, 342 (Bankr. E.D.Pa.1988). Likewise, we have held that the definition of an executory contract should also be very broad. *In re Walnut Associates*, 145 B.R. 489, 496 (Bankr.E.D.Pa.1992).

In this district, we are required to apply the definition of an executory contract which was adapted from V. Countryman, *Executory Contracts In Bankruptcy: Part I*, 57 MINN.L.REV. 439, 450–62 (1973), in *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3rd Cir.1989). Under this definition, a contract is executory if substantial performance remains due from both parties of the contract.

Most courts which have applied this definition to option contracts have concluded that an option contract is an executory contract. *See, e.g., In re Waldron*, 36 B.R. 633, 639 (Bankr.S.D.Fla.1984), *rev'd on other grounds*, 785 F.2d 936 (11th Cir.1986) ("An interpretation of the option contract as an executory contract benefits the estate, since it allows for it to be dealt with in the bankruptcy proceeding and ... does not detract from the protection afforded ... the creditor."); *In re Hardie*, 100 B.R. 284, 286 (Bankr.E.D.N.C.1989) ("[t]he debtors had the continuing obligation under the [option] contract to forebear from revoking their offer to sell and the prospective purchaser had the unperformed obligations remaining of tendering its acceptance of the offer and then

---

13. We reiterate that we are unconvinced that the parties intended the Option to be a separate, independent agreement. *See* pages 461–63 *supra. See also Equitable Trust Co. v. Delaware Trust Co.*, 30 Del.Ch. 118, 128, 54 A.2d 733, 738 (1947) (" 'If there be a single assent to a whole transaction, involving several things or several kinds of property, a contract is always entire,' " quoting *Orenstein v. Kahn*, 13 Del.Ch. 376, 381, 119 A. 444, 446 (1922)). It appears that our skepticism was shared by the court in *In re Texstone Venture, Ltd.*, 54 B.R. 54 (Bankr. S.D.Tex.1985), a case cited by Pueblo. In that case, a bank made a pre-petition loan to debtor which entitled the bank, at its option, to take an equity participation in debtor's building in lieu of principal payments. *Id.* at 55. The bank's rights under the equity option were set forth in a separate document entitled "Option and Purchase Agreement." *Id.* The court noted, however, that

"[a]lthough these different parts of the loan obligation were evidenced by separate documents, the loan commitment and the cross-references in the documentation evidence that each of the separate obligations constituted part of the consideration for the loan...." *Id.* The debtor sought to reject the unexercised option. *Id.* at 55–56. The court denied debtor's motion, noting that the option was "actually merely an alternative method of principal repayment" for a loan which had already been made pre-petition. *Id.* at 56.

As in the *Texstone* fact situation, we believe that the Option in this case is also an alternative to principal and interest repayment and therefore is part of the Term Sheet, not an independent contract. However, in contrast to the facts of *Texstone*, Pueblo did not extend the loan contemplated by the Term Sheet pre-petition, and therefore, cannot expect the same ultimate outcome as the lender in *Texstone*.

complying with the terms of purchase"); *Sundial Asphalt, supra,* 147 B.R. at 83 (adopts the reasoning of *Hardie,* quoting large sections of the opinion with approval). *See also In re Jackson Brewing Co.,* 567 F.2d 618 (5th Cir.1978); *In re A.J. Lane & Co.,* 107 B.R. 435 (Bankr.D.Mass.1989); *In re Carlisle Homes, Inc.,* 103 B.R. 524 (Bankr. D.N.J.1988); and *In re G–N Partners,* 48 B.R. 462 (Bankr.D.Minn.1985).[14] We likewise conclude that, even if the Option is a valid, independent contract, it is an executory contract which the Debtor may reject.

■ Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet. *See W. & L., supra,* 71 B.R. at 966 ("We do not consider the 'business judgment test' to be a strict standard to meet."); and *Metro Transportation, supra,* 87 B.R. at 343 ("We reiterate that the 'business judgment test' is not a 'strict standard to meet.'"). We will not substitute our own business judgment for that of the Debtor, nor will we disturb its decision to reject the Option unless "the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim." *Hardie,* 100 B.R. at 287. *See also Sundial Asphalt,* 147 B.R. at 81–84.

■ Pueblo argues that the Debtor cannot clear even the very low hurdle of the business judgment test because of its claims that, if it exercised the Option, the Debtor would receive far more for the OEE shares than they are presently worth. We doubt that the Option is such a "sweetheart deal" for the Debtor. The fact that the Debtor is trying to reject the Option while Pueblo is striving mightily to enforce it belies Pueblo's assertions to the contrary. The stance of Pueblo as an opponent of the Motion, as opposed to any of the other creditors of the Parent who are interested in the resolution of this dispute, is testimony to the likelihood that rejection is perceived by all to serve the Debtor's business interests.

Scenarios which exemplify the benefit to the Debtor from rejection of this purported contract are easily conceived. For example, Sumerlin acknowledged in her testimony that Pueblo needed a two-year option so that it "could build the company up, which is, of course, what we needed to do to justify paying five dollars a share...." If Pueblo successfully "built up" OEE over the term of the Option, there is no telling what the stock would be worth at that time, or if the $5.00 per share price would be a good one.

We think that it is well within Debtor's reasoned business judgment to decide that it is better off trying to market or otherwise utilize the OEE stock today, in the context of its financial recovery, as opposed to requiring the Debtor to wait an indeterminate number of years to see if Pueblo will exercise the Option, a occurrence which is by no means certain. *See Metro Transportation, supra,* 87 B.R. at 341 (the arguments of one of the parties to a contract sought to be rejected that the debtor would benefit "from receipt of the potential $2 million flowing to it under the escrow agreement" was found not adequate to bring into question the debtor's business judgment to reject contract).

■ Pueblo's remaining arguments are unpersuasive, and we shall dispose of them summarily. First, Pueblo argues that it is entitled to specific performance if Debtor breaches the Option, and, therefore, we should not permit Debtor to reject the Option. In light of our holdings at pages 460–67 *supra* that we consider there to be no enforceable contract in existence between the parties, Pueblo's expectation of specific performance cannot succeed. Even if Pueblo would be entitled to specific performance, that is merely a consequence which flows

---

14. Of all the cases cited by Pueblo for the contrary proposition, only two support possibly the conclusion that option contracts are not executory. *See In re Nine Associates, Inc.,* 76 B.R. 943 (S.D.N.Y.1987) (in which, moreover, the court merely states that the argument on this issue was "substantial" in affirming a decision on a fee application); and *In re Giesing,* 96 B.R. 229 (Bankr.W.D.Mo.1989). To the extent that these courts have articulated their reasons for so holding, we find them unpersuasive.

from the Debtor's rejection and consequent breach. While this may very well be a relevant consideration when determining the effect of a debtor's rejection of a contract, *Walnut Associates, supra,* 145 B.R. at 489, it does not dictate that we should, in every instance, deny such a request. *See, e.g., Hardie, supra,* 100 B.R. at 287 ("[a] contract could be subject to rejection under § 365 even if the remedy of specific performance for breach of that contract would be available were it not for the § 365 rejection").

Finally, Pueblo argues that we can deny the Debtor's request to reject the Option because the Debtor filed its bankruptcy in bad faith for the sole purpose of rejecting the Option. Initially, we seriously question whether there is a "good faith" filing requirement for a Chapter 11 bankruptcy debtor. *See In re TLCS, Inc.,* 1990 WL 52053, slip op. at *2 (Bankr.E.D.Pa. April 20, 1990); *In re 1606 New Hampshire Ave. Associates,* 85 B.R. 298, 308 (Bankr.E.D.Pa.1988); and J. Flaccus, *Have Eight Circuits Shorted? Good Faith & Chapter 11 Bankruptcy Petitions,* 67 AMER.BANKR.L.J. 401, 402–04 (1993). More specifically, we have held that filing a bankruptcy in order to reject an executory contract does not constitute bad faith. *See W. & L., supra,* 71 B.R. at 967–98 ("We do not think that the exercise of rights granted to it by the Code by the Debtor constitutes an abuse of bankruptcy."). *Accord, Sundial Asphalt, supra,* 147 B.R. at 80–81 (" 'It is not deemed an abuse of the bankruptcy process to file a Chapter 11 petition solely to reject an executory contract,' " quoting *In re Bofill,* 25 B.R. 550, 552 (Bankr. S.D.N.Y.1982)).

Nor are we convinced that Debtor filed its bankruptcy only to reject the Option. As Sumerlin pointed out, O'Brien and/or his various companies were troubled with tax liabilities and bank debt even before the negotiations with her company which resulted in the matter before us. Indeed, we note that counsel for the banks who have loan agreements with the Parent have kept a close eye on these proceedings. O'Brien apparently believes that, through the Debtor, he can utilize the OEE stock to address his global problems. He has therefore placed the Debtor, the Parent, and two of his other entities into bankruptcy, presumably with the intent of crafting some sort of cooperative reorganization strategy which has now presumably been manifested in the Parent's plan. This is exactly what Chapter 11 is intended to allow.

## D. CONCLUSION

In light of our foregoing conclusions that neither the Option nor the Term Sheet constitute binding contracts between the Debtor and Pueblo, we grant that aspect of the Debtor's Motion requesting that we find that it cannot assume any contracts with Pueblo because no contracts between them exist. In light of the *res judicata* effect that this decision would appear to have upon the Delaware Action, it is not clear that Pueblo will even still wish to pursue the Cross Motion for relief from the automatic stay. In any event, we will dismiss the Cross Motion at this juncture in light of its improper procedural stature as a "cross-motion." An appropriate Order will be entered.

### ORDER

AND NOW, this 3rd day of February, 1994, after a hearing of January 12, 1994, on the Motion of III ENTERPRISES, INC., V ("the Debtor") seeking to have this court find that no binding contracts exist between it and Pueblo Chemical, Inc. ("Pueblo") or, in the alternative, to reject any executory contract between it and Pueblo as described therein ("the Motion"), and the Cross Motion of Pueblo for relief from the automatic stay to pursue certain litigation as described therein against the Debtor ("the Cross Motion"), and upon consideration of the various Briefs submitted by the parties relevant thereto, it is hereby ORDERED AND DECREED as follows:

1. The Motion is GRANTED in part. It is determined that there is no valid enforceable contract between the Debtor and Pueblo as described therein.

2. The Cross–Motion is DISMISSED without prejudice as improperly filed and served.