**Leonard S. LEEDS and Parkview Convalescent Center, Inc., Plaintiffs,**

v.

**FIRST ALLIED CONNECTICUT CORPORATION, a Delaware corporation, and Leo J. Dugan, Jr., Recorder of Deeds in and for New Castle County, Defendants.**

**Civil Action No. 8594.**

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 25, 1986.
Decided: Dec. 8, 1986.

---

Paul P. Welsh, and Palmer L. Whisenant, of Morris, Nichols, Arsht & Tunnell, Wilmington, for plaintiffs.

Louis B. Ferrara, and Michael W. Modica, of Aerenson, Ferrara & Lyons, Wilmington, for defendants.

## OPINION

ALLEN, Chancellor.

In this contract action the principal issue is whether an agreement signed by both

parties constitutes a contract. Plaintiff, asserting that it does not, sues to remove a cloud on title to real estate caused by defendant's recording of the document which it contends to be a contract to sell that land. Defendant has counterclaimed for specific performance of the alleged contract. This is the Court's opinion on both of these claims following a two-day trial.

## I.

■ It is elementary that determination of the question whether a contract has been formed essentially turns upon a determination whether the parties to an alleged contract intended to bind themselves contractually. A court determining if such intention has been manifested, however, does not attempt to determine the subjective state of mind of either party, but, rather, determines this question of fact from the overt acts and statements of the parties. *Industrial America, Inc. v. Fulton Industries, Inc.*, Del.Supr., 285 A.2d 412, 415 (1971). Thus, the ordinary meaning of the language employed in writings reflecting agreements, the course and substance of negotiations, prior dealings between the parties and customs or practices in their trade or business are typically turned to in order to determine whether the parties intended to bind themselves. Under this approach, the so-called "objective" theory of contract law, the unexpressed, subjective intention of a party is irrelevant.

Thus, in this case, our task is to determine the factual setting in which the document that is here claimed to constitute a contract was negotiated and executed and to decide the factual question whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations and formed a contract. I turn then first to a statement of the facts of this case from which such determination must be made.

## II.

Plaintiff, Leonard Leeds, is the owner of Parkview Convalescent Center, a 150–bed nursing home located in the city of Wilmington. The written agreement asserted to be a contract relates to a sale of Parkview to defendant First Allied Connecticut Corporation.

Following the sale in 1984 of another nursing home in which Mr. Leeds had an interest, he decided to solicit offers to purchase Parkview. In the earlier nursing home sale, the seller had financed the sale by taking back tax-exempt industrial revenue bonds (IRBs) that were issued as an economic development measure by a state agency specifically in connection with that sale. The appeal of tax-exempt IRB financing to a seller who was willing to himself finance a large part of the transaction—as Leeds apparently was—is obvious and Leeds had it in his mind from the start that IRB financing would be a desirable aspect of any sale of Parkview.

In mid–1985 Leeds placed a small advertisement in two national publications inviting indications of interest in the purchase of Parkview. William Sondericker, a young professional employee of Mr. Malcolm Glazer—the sole shareholder of First Allied Connecticut—saw one of the ads, and in August Mr. Sondericker wrote Leeds expressing an interest in discussing a possible deal. While Mr. Sondericker is relatively new at the business of negotiating the acquisition of businesses, his employer, Mr. Glazer, is expert in that field. A self-made man, Glazer has negotiated and acquired many businesses, for his own account, across the country. Among these are four or five nursing homes, mobile home parks and television stations. Mr. Glazer is a knowledgeable and sophisticated businessman. Sondericker, who had, with one important exception, all of the communications with Leeds, reported regularly and fully to Glazer.

The Sondericker-Leeds negotiations began with a call by Leeds to Sondericker on August 20, 1985. Their accounts of that conversation differ somewhat.

According to Leeds, he had a standard "spiel" which he gave to Sondericker: the price asked was $4.5 million, but if IRB financing was arranged, the price would be $3.5 million; the deal would require $1 million cash down and Leeds would take back the remainder with a 25–year installment note (or bonds) at 12 percent interest. According to Leeds, a significant pre-payment penalty and a one million dollar payment if the IRBs became for any reason taxable, were also mentioned as conditions of the sale.

Sondericker recalls a price of $4 million being mentioned, with $1 million down. He also recalls IRB financing being mentioned, but says he never had encountered IRBs and didn't understand them. To him, the significant facts (other than those concerning the value of the property) were the price, the amount of cash required, and that the seller would finance the purchase.

Sondericker concluded the original conversation by asking for financial information concerning Parkview, which Leeds promptly provided. Sondericker and Leeds talked on other occasions during this period. After receipt of financial information from Leeds, Sondericker consulted with Glazer. Glazer decided that the deal required too much cash to be attractive.[1] He instructed Sondericker to let the situation sit for sixty days and to then see if the the deal could be made more attractive.

Towards the end of October, Sondericker contacted Leeds again to ask if there had been any change in his position. Leeds replied that he would take $3.5 million with one million down (*i.e.,* according to Leeds, the same thing he had said in August; according to Sondericker a $500,000 reduction in price). Some further mention of IRB financing was made, but again that did not cause Sondericker to understand

that in order to make such tax-exempt financing available, the investor—Glazer in this instance—would have to invest 15% of the value of bonds in capital improvements to the facility whose purchase was being financed with the bond proceeds. Indeed, there is no indication in the record, as I recall it,[2] that Leeds himself understood that technical requirement at that time. In all events, Sondericker continued to think of IRB financing as simply some version of seller financing, and took the view that how Leeds wanted to arrange the form of the obligation he would take back was Leeds' concern. Glazer also testified that that was his view as well. While it is credible that the relatively inexperienced Sondericker may have failed to grasp the significance of IRB financing to a seller taking back paper, it is far less likely that Mr. Glazer, a businessman very experienced in the purchase and sale of businesses, failed to understand the importance to such a seller of getting tax-exempt financing if available.

In all events, Sondericker continued to have conversations with Leeds and continued to report to Glazer. Leeds had had several indications of interest in Parkview but no firm offer. At some point, Sondericker succeeded in getting Leeds to reduce the cash portion of the deal to $750,000. At this point, Glazer became interested. Sondericker arranged a telephone call among himself, Glazer and Leeds. The call which apparently occurred on November 14, 1985, lasted only a short time. Glazer said he was interested in buying Parkview at $3.5 million, but the cash down payment was too high. He offered $500,000 down and the parties quickly compromised on $600,000.

According to Leeds, Glazer said he would send out a "letter of intention" for Leeds

---

1. Glazer's testimony is that the price asked at that time ($4 million on his testimony) was too high. Leeds testified that the price was always $4.5 million on a non-tax advantaged form of transaction and $3.5 million on an IRB, tax-exempt deal. I do not believe Mr. Glazer's memory is accurate on this point. He planned from the outset to acquire Parkview, if at all, through a corporation that would have no substantial assets other than Parkview. He never agreed

nor would he agree to personally guarantee any part of the acquiring corporation's obligation to Leeds. Thus, while price was a very important consideration, the more significant aspect of the deal was clearly how much cash was required, for that defined his risk in the transaction.

2. The parties have not had a transcript of testimony prepared.

to sign because he (Glazer) had in the past dealt with persons without authority. Thereafter, the parties could enter into a formal contract. Leeds does not report that in this short conversation he brought up the list of his "requirements" previously described.

According to Glazer (and Sondericker), once the price, the down payment, and the interest rate on the purchase money note had been agreed upon, Glazer asked if Leeds would sell on those terms. When Leeds responded yes, Glazer said he would put a "contract" promptly in the mail for Leeds to execute and return.

Glazer immediately had the following document prepared:

Dear Mr. Leeds:

We wish to purchase all of the assets and real property known as Parkview Convalescent Center, 2801 West 6th Street, Wilmington, Delaware 19805 ("Seller"), being a nursing home fully equipped and licensed for 150 patients, and Seller has a Certificate of Need for an additional 82 beds, and including all buildings, land of approximately one (1) acre, and any other assets of the nursing home, subject to the inspection of the books, records, and assets which must be satisfactory to the Buyer on the following basis:

Price. $3,500,000.00 (THREE MILLION FIVE HUNDRED THOUSAND DOLLARS)

Terms. $ 600,000.00 (SIX HUNDRED THOUSAND DOLLARS) maximum cash on date of transfer of title to Buyer.

$2,900,000.00 (TWO MILLION NINE HUNDRED THOUSAND DOLLARS) approximate bond to be taken back by Seller, payable principal and interest at 12%, payable approximately $30,544.00 per month for a period of 25 years.

In the event Buyer adds additional beds to the Parkview Convalescent Center, Seller agrees to subordinate its bond to any new first mortgages or bonds, and in that event the interest rate on the Sell-

er's bond would increase from 12% to 14%.

This offer is good until November 19, 1985 at 6:00 P.M., Rochester, New York time.

Please advise if the above will be acceptable to you.

The document was signed by an officer of FACC, a corporation with no assets.[3] It was dated November 15, sent on November 14 and received by Leeds on the 15th. Leeds "accepted" the letter agreement by signing it immediately and returning it by express mail to FACC on November 16.

Following the November 14 conversation but before "accepting" the FACC letter of November 15, Leeds also drafted a letter which contained the first written statement of the detailed provisions that Leeds had in mind. It was addressed to Sondericker and provided as follows:

Dear Bill:

In order that we may proceed as quickly as possible with a final and acceptable contract, I am taking the liberty of providing you with some terms which must be part of the transaction. If all of them are understood from the outset, it will save a lot of legal maneuvering and mailing back and forth.

The price and terms at which it is being offered are only possible because of the availability of IRB financing. If this were to be a cash deal, the price would be 4.5 million. Therefore, if any event causes the bonds to become taxable, or default, they would be due and payable immediately with an additional payment of one million dollars. I do not want any prepayment or balloon in the note. Building to be sold in "as is" condition with the stipulation that all major systems are in good operating order at the time of transfer.

I will be responsible for all liabilities of the corporation up to the day of transfer. I will retain the corporation but give up the name. All income and assets of the corporation predating transfer will re-

---

**3.** Glazer introduced documents establishing that at that time he had $1.6 million in cash in a Wilmington bank and testified that he intended to use a portion of those funds to accomplish this transaction.

main mine. Transfer taxes will be split equally, the normal custom here. All fees associated with bonding will be your responsibility.

The actual sale will be from seller to Bonding Authority and then to you. It is a somewhat complicated transaction and perhaps it would be simpler to have a Delaware attorney do the actual contracts after a basic and perhaps simpler sales agreement.

If you have any questions about any of the above, please do not hesitate to contact me. I look forward to a mutually satisfactory conclusion to our transaction.

Curiously, Leeds did *not* send the November 16 draft letter that he had prepared reflecting his desires for additional terms when he signed and returned First Allied Connecticut's letter.

Upon receiving the signed November 15 document, Glazer went through the ritual of convening the board of FACC (he is the corporation's sole director) and adopted a resolution approving the execution of the November 15 document. This formality is, of course, consistent with Glazer's litigating position that he viewed the November 15 document as his contract to buy Parkview and not simply as an expression of interest or a "letter of intention." This action is also consistent with plaintiff's assertion that Glazer is a clever, aggressive businessman who tried to outsmart Leeds in getting him to sign what plaintiff claims is a vacuous-appearing ("We wish to purchase . . ."), one-sided (". . . subject to [an] inspection . . . which must be satisfactory to Buyer") paper and was, through this corporate formality, trying to technically shore-up his advantage.

At the time the November 15 document was signed, no representative of FACC had inspected or even seen the Parkview property. An inspection trip took place on December 9, at which time no aspect of the deal, its documentation, or schedule, was discussed. Thereafter, Leeds contacted Sondericker. In Leeds' version of the discussion, Leeds wanted to set up a meeting to negotiate a formal agreement and he

mentioned at that time that he wanted a pre-payment penalty included in the purchase money note. In Sondericker's version, Leeds called to say he wanted a pre-payment penalty provision and, after Sondericker consulted Glazer, a trip to Wilmington for December 19 was agreed upon. Sondericker told Leeds that they would prepare a paper for discussion purposes.

Leeds then, for the first time, retained a lawyer. He told the lawyer that a meeting was set for December 19, and that Glazer would be sending down a draft contract before the meeting. He did not mention to his lawyer that he had signed the November 15 paper. Sondericker and Glazer had a four-page single-spaced standard contract form that Glazer had apparently used in the purchase of other nursing homes. That document was modified to reflect the financial terms agreed to on November 15 and to include the specific pre-payment penalty requested by Leeds. Glazer and Sondericker did not send this draft down in advance, but brought it with them to the meeting.

The December 19 meeting did not go well. The parties approached the subject from very different perspectives. Up to this point, Leeds had apparently been treading very softly, raising his positions early-on but not causing much attention to be paid to them. His decision not to send the November 16 draft letter, for example, is best explained, in my mind, not as reflecting an abandonment of the positions reflected in that letter, but rather as a decision, having raised them in some light fashion, to let the relationship with Glazer and Sondericker mature and the deal develop further before making an issue of those points. Now Leeds was represented by an attorney who wanted to assert his client's interests aggressively.

Glazer approached the negotiations from the perspective of a man who had gone through the corporate ritual of adopting resolutions approving the November 15 "contract." In other words, he, in effect, seems ultimately to have taken the position in that meeting that he already had a deal

and any modifications would be on his terms. Significantly, the November 15 paper was brought to this meeting by neither Glazer nor Leeds.

The parties could agree on virtually nothing. Such minor points as who would pay for title insurance and transfer taxes (matters as to which established local practice gave clear guidance as to a reasonable accommodation) could not be agreed upon. Leeds took the position that attorneys' fees in connection with the IRB financing (probably $25,000 to $35,000) would be for FACC's account. Glazer said the IRB financing was not something he had any interest in and, if Leeds wanted it, Leeds should pay for it. The parties never seemed to discuss what would probably have been a deal breaker even had agreement been reached on the other points— that is the requirement for the investor in the IRB-financed acquisition to invest 15% of the value of the property in capital improvements to the property. Such a requirement would almost double the cash Glazer would have to put into the deal and would radically change the economics of the transaction from his perspective.

The day-long meeting was not in all respects pleasant. At some point Leeds decided that he did not want to do business with Glazer, although he allowed Mr. Glazer to continue to think they were working towards a deal. The meeting terminated with Leeds stating that he or his lawyer would be getting back to Sondericker with their positions on various of the subjects discussed.

About a month later, after several telephone inquiries from Sondericker, Leeds wrote to Sondericker disclaiming any interest in "doing a deal" with First Allied. Sondericker then promptly replied, asserting that First Allied had "a signed acceptance dated November 16, 1985 ... of our offer to purchase," and "[w]e are proceeding towards a closing thereof." Thereafter, First Allied recorded the November 15 document and Leeds continued his search for a buyer. Very recently, he has entered into an elaborately-drafted contract of sale containing most of the provisions reflected in his unsent letter of November 16.

### III.

The central question presented is whether a contract to sell Parkview was formed when Leeds signed and returned the "offer" of November 15. Because I conclude, for the reasons that follow, that no contract was formed, I do not need to address the subsidiary positions advanced by plaintiff.

While I am persuaded by the evidence that Leeds did not intend to bind himself to sell Parkview on the terms set forth in the November 15 letter, that conclusion is not helpful to him in this litigation, for the law is clear in Delaware, as elsewhere, that subjective intention is itself not the test of whether a contract has been formed. As our Supreme Court stated in *Industrial America, Inc. v. Fulton Industries, Inc.*, Del.Supr., 285 A.2d 412, 415 (1971):

It is basic that overt manifestation of assent—not subjective intent—controls the formation of a contract; that the "only intent of the parties to a contract which is essential is an intent to say the words or do the acts which constitute their manifestation of assent"....

Accordingly, our inquiry is the "objective" one: whether a reasonable man would, based upon the "objective manifestation of assent" and all of the surrounding circumstances, conclude that the parties intended to be bound by contract. *See Industrial America, Inc.*, 285 A.2d at 415; *Western Natural Gas Co. v. Cities Service Gas Co.*, Del.Supr., 223 A.2d 379, 382–83 (1966).

This is not a simple or mechanical test to apply. Negotiations typically proceed over time with agreements on some points being reached along the way towards a completed negotiation. It is when all of the terms that the parties themselves regard as important have been negotiated that a contract is formed. 1 *Corbin on Contracts* § 29 at 87–88 (1963); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.1984); *cf. Universal Products Co. v. Emerson*, Del.Supr., 179 A. 387, 394

(1935). In determining whether agreements reached were meant to address all of the terms that a reasonable negotiator should have understood that the other party intended to address as important, courts look to all of the surrounding circumstances, including the course and substance of the negotiations, prior dealings between the parties, customary practices in the trade or business involved and the formality and completeness of the document (if there is a document) that is asserted as culminating and concluding the negotiations.

Until it is reasonable to conclude, in light of all of these surrounding circumstances, that all of the points that the parties themselves regard as essential have been expressly or (through prior practice or commercial custom) implicitly resolved, the parties have not finished their negotiations and have not formed a contract. Agreements made along the way to a completed negotiation, even when reduced to writing, must necessarily be treated as provisional and tentative. Negotiation of complex, multi-faceted commercial transactions could hardly proceed in any other way. *See International Telemeter Corporation v. Teleprompter Corporation,* 592 F.2d 49 (2d Cir.1979) (Friendly, J., concurring).[4]

The November 15 document clearly evidences agreement concerning key elements of the transaction these parties were negotiating—price, principal amount of the note, its term and interest rate. The relevant factual inquiry is whether Sondericker and Glazer, as agents of First Allied Connecticut, did reasonably understand that in signing that document Leeds intended to conclude negotiations. If they (or what amounts to the same thing, a hypothetical "reasonable man" in these circumstances) could not reasonably so believe, then it follows that they had reason to understand that material elements of the transaction remained to be negotiated and could not conclude that an intention to be bound to a *contract* had been manifested by the making of the agreement of November 15.

■ In light of all of the circumstances, I conclude that a reasonable person in the circumstances of Mr. Glazer could not have understood that the November 15 document represented a completed negotiation. Most importantly, Sondericker and Glazer knew that IRB financing was an important point that Leeds had brought up on several occasions with Sondericker and that the point had not been dealt with. Glazer knew or should have known that the tax-free status of interest on such bonds would be an important term to one who had raised the question. He could not reasonably assume, in these circumstances, that this point had been abandoned.

■ Moreover, while it is surely possible to make a binding contract to sell a $3.5 million business, including real estate, on a single page, it would be extraordinary to do

---

**4.** Judge Friendly quotes from 2 Schlesinger (ed.), *Formation of Contracts: A Study of the Common Core of Legal Systems* at 1584–86 (1968) the following passage that fairly reflects the typical course of negotiating a significant commercial transaction. It is the pattern that Leeds, at least, had in mind when he confirmed the agreements reached on November 14 by signing the letter agreement of November 15:

Especially when large deals are concluded among corporations and individuals of substance, the usual sequence of events is not that of offer and acceptance; on the contrary, the businessmen who originally conduct the negotiations, often will consciously refrain from ever making a binding offer, realizing as they do that a large deal tends to be complex and that its terms have to be formulated by lawyers before it can be permitted to become a legally enforceable transaction. Thus the original negotiators will merely attempt to ascertain whether they see eye to eye concerning those aspects of the deal which seem to be most important from a business point of view. Once they do, or think they do, the negotiation is then turned over to the lawyers, usually with instructions to produce a document which all participants will be willing to sign....

\* \* \* \* \* \*

... After a number of drafts have been exchanged and discussed, the lawyers may finally come up with a draft which meets the approval of all of them, and of their clients. It is only then that the parties will proceed to the actual formation of the contract, and often this will be done by way of a formal 'closing' ... or in any event by simultaneous execution or delivery in the course of a more or less ceremonial meeting, of the document or documents prepared by the lawyers. *International Telemeter,* 592 F.2d at 57.

so. Absent a clear indication that the other party intended that unusual course, a reasonable commercial negotiator—and surely one with Mr. Glazer's experience—could not conclude in these circumstances that that was intended. For example, putting aside the question of the impact on the transaction of having IRB financing available, there are myriad topics and terms utterly conventional when a commercial seller in a significant transaction takes back a note—such as financial covenants, including restrictions on dividends or other stockholder distributions; warranties concerning the financial condition and due organization of the maker of the note; and terms defining and governing defaults and cures of default. There is no legal requirement that these topics be dealt with before negotiations resulting in agreements may be regarded as having concluded in a contract. But, unless there is some affirmative basis to suppose that the parties actually intended to pass over such points, a reasonable negotiator in a transaction of this size and type would not be justified in concluding that such was the unexpressed intention.

I therefore conclude as a factual matter,[5] that, judging from the conduct of the parties and the setting and course of their negotiations, no intention to be bound by a contract was expressed in the November 15 agreement. This conclusion is further supported by the evidence which tends to show that neither Leeds nor Glazer really thought of the negotiations as having been completed as of November 15. Neither Glazer nor any agent of his had even yet seen Parkview. Moreover, he did not bring a copy of the November 15 agreement to the meeting of December 19 which was set up for the purpose of further negotiations. Finally, the language of that document itself ("We wish to purchase....") when contrasted with the language of the December 19 proposal ("First Allied Connecticut Corporation ("Buyer"), agrees to purchase....") further supports the conclusion that the parties themselves did not intend the November 15 agreement to reflect their final, binding understanding.

Thus, I find that although the parties reached certain agreements on November 14 and recorded and evidenced them in the writing of November 15, those agreements were not intended to be contractual, in the sense of creating legal rights and duties. The negotiations had not yet reached the point at which a contract was formed.

So concluding, I need not address plaintiff's contentions that FACC's obligations under that document were illusory or that Mr. Glazer is too clever and sharp in his negotiating practices to be afforded the aid of a court of equity. I should say, however, on this latter point that while Mr. Glazer is no doubt a clever man and likely sought some advantage in putting the understandings reached on November 14th in the form he did in the letter agreement of November 15, there is no basis in the evidence to conclude that he is not a man of integrity, as worthy as his adversary of the aid of this court, in an appropriate instance.

Judgment will be rendered for plaintiff on his claim and against defendant on its counterclaim. A form of implementing order shall be submitted on notice.

---

5. As the question whether the parties intended their agreement to conclude their substantive negotiations and thus bind themselves to a contract is one of fact, a discussion of cases holding whether a particular negotiation resulted in (or did not culminate in) a contract is of limited guidance. This is illustrated by the case of *Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 305 A.2d 689 (1973), upon which defendant heavily relies. While that case has some factual features similar to this one, it has as well aspects that are very different (*see, e.g.,* 305 A.2d at 692 n. 2). The Pennsylvania Supreme Court on those facts affirmed a finding that a contract was formed stating, "what is necessary is that the parties agree to all the essential terms *and intend the letter to be binding upon them.* We believe the letter in question manifests such agreement and intention." 305 A.2d at 694 (emphasis added). I concur in this summary statement of the applicable law, but on the evidence cannot reach a similar factual conclusion.