# COURT OF CHANCERY
# OF THE
# STATE OF DELAWARE

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

September 14, 2021

Richard L. Abbott, Esquire
Abbott Law Firm
724 Yorklyn Road, Suite 240
Hockessin, Delaware 19707

Adam Singer, Esquire
New Castle County Government Center
87 Reads Way
New Castle, Delaware 19720

RE: ***Hyetts Corner, LLC v. New Castle County***,
Civil Action No. 2020-0940-MTZ

Dear Counsel:

A dispute over landscaping and maintaining open space in a new housing development has spurred a rift between the developer and New Castle County. The developer, hoping to wrap up the project, seeks to secure the final permits it needs to begin construction on the remaining lots. The County has withheld those permits due to outstanding issues in the development's open space. Despite admittedly not completing all the remaining work, the developer has petitioned this Court to compel the County to issue at least some of the remaining permits, pointing to a series of emails from a county representative. The developer's claims invoke contract, quasi-contract, and equitable principles, and are all premised on its view that the County's emails constitute enforceable promises.

At the hearing on the County's pending motion to dismiss, I indicated this matter would likely be dismissed, at least in part, for the developer's failure to plead an enforceable agreement.[1] This letter memorializes my conclusion that the developer's verified complaint fails to state a claim under Court of Chancery Rule 12(b)(6). For the reasons that follow, the County's motion is granted.

## I. BACKGROUND[2]

Plaintiff Hyetts Corner, LLC ("Hyetts") is the developer of a residential subdivision in Middletown, Delaware, known as The Enclave at Hyetts Crossing (the "Development"). In the summer of 2007, Defendant New Castle County (the "County") approved Hyetts's development plan, which subdivided the seventy-eight-acre Development into eighty-four lots designed for single family residential homes. The Development also contains several open space areas, including stormwater facilities (together, the "Open Space"). In connection with Hyetts's development plan, Hyetts and the County entered into a Land Development Improvement Agreement (the "LDIA"), which provided for the construction,

---

[1] *See* D.I. 25 at 65:4–15 [hereinafter "Hr'g Tr."].

[2] On this motion to dismiss, I draw the following facts from the plaintiff's Verified Complaint, available at Docket Item ("D.I.") 1 [hereinafter "Compl."], as well as the documents attached and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014).

maintenance, and acceptance of improvements in the Development's Open Space. Hyetts also submitted, and the County approved, a "Landscape Plan" that governed the Open Space's landscaping and layout. To maintain the Development, Hyetts formed nonparty Windsor South at Hyett's Corner Maintenance Corporation (the "Maintenance Corporation"), which is now controlled by the Development's homeowners.

Since 2007, seventy-eight of the eighty-four lots in the Development have been sold to homebuilders and subsequently purchased by residential homeowners. The final six lots remain undeveloped (the "Undeveloped Lots"). The Undeveloped Lots have been under contract with a homebuilder for over a year; closing has been delayed by the lack of building permits. The County has withheld the building permits for the Undeveloped Lots due to certain maintenance issues in the Open Space.

The parties' dispute began in 2019, when County inspectors uncovered certain deficiencies in the Open Space. In a cycle that would repeat itself, the County raised issues, Hyetts made improvements, and the County found new issues upon reinspection. Attempting to break this cycle, Hyetts representatives met with representatives from the County's Department of Land Use on July 25, 2019. Counsel for Hyetts followed up with an email that evening, suggesting the meeting

was productive and summarizing the discussion.[3] Jim Smith, a County representative, responded the next day and indicated he and his staff would reply at some point "early next week."[4]

The parties' discussions eventually focused on reaching a "Completion Agreement." Some context on the County's process for inspecting subdivision progress and issuing building permits may be helpful. The New Castle County Unified Development Code (the "Code") requires developers to reach certain development milestones on community spaces before building permits can be issued.[5] For a development with open space, that work "shall be completed at such time the open space area or common facilities are no longer directly and materially affected by construction activity but shall be completed no later than the issuance of ninety (90) percent of permits for dwelling units."[6] The Department of Land Use

---

[3] *See* Compl. Ex. 1.

[4] Compl. ¶ 24; *id.* Ex. 2.

[5] For example, the Department of Land Use may not issue more than fifty percent of the total building permits within a subdivision until "all active recreation areas and structured facilities . . . have been turned over to the community" and "the community entrance signs have been installed." New Castle Cty. C. § 40.27.310(B)(1), (6); *see also id.* § 40.27.610(A) ("Transfer of control of the maintenance corporation from the developer to the homeowners must be completed no later than the issuance of seventy-five (75) percent of the permits for the dwelling units within the subdivision.").

[6] *Id.* § 40.27.310(D).

may, "for good cause shown, allow additional time for completion of the open space" upon certain conditions and upon approval of the developer's written proposal.[7] That approval may take the form of a Completion Agreement.[8]

On September 12, Kurt Schultz, a Hyetts representative and member of the Maintenance Corporation, emailed Smith complaining that the delay in reaching a Completion Agreement was preventing construction on homes for buyers currently staying in temporary housing.[9] Smith's response later that day states, in its entirety:

---

[7] *Id.* § 40.27.310(E).

[8] Hyetts describes the Completion Agreement as a "boilerplate document" the County frequently used to create a comprehensive "checklist" of the remaining work. Compl. ¶ 28. *But see* D.I. 13 at 7–8. Counsel clarified at argument that while there is no form Completion Agreement in the Code itself, Completion Agreements are a matter of common practice. *See* Hr'g Tr. 23:22–24:5, 48:18–49:9; *see also* New Castle Cty. C. § 40.27.310(E).

[9] Compl. Ex. 3 at 1–2.

Kurt,

Thanks for your email. Earlier this week, I had a meeting with Public Works, made a site visit with Chip O'Connor and met with Ramesh Batta [from Hyetts]. I understand the urgency on your end, and I will try to free up as many permits as I can. I plan to have the Completion Agreement done tomorrow, after which I will review it with Public Works and forward to you for execution next week.

Regards,

Jim Smith[10]

Hyetts seizes on this message, referring to it as the "Completion Agreement Promise" and alleging the County breached it by not executing a Completion Agreement.[11]

Schultz responded, thanking Smith, and indicating that the Hyetts team would work on resolving the remaining issues.[12] On September 18, Smith sent Schultz another message:

---

[10] *Id.* at 1.

[11] *E.g.*, Compl. ¶ 26.

[12] *Id.* Ex. 4 at 1–2.

> Thanks for trying to bring this to a completion. I promised you that I would have the Agreement ready for your group to execute this week. Unfortunately, things have not gone as smoothly as anticipated (with other matters) this week, and I am unsure that will occur. However, in recognition of your efforts, and to help get you started on the two homes for the buyers who are in transition, I am authorizing the 2 permits that I promised would be released when the Agreement was executed, now. That will allow your team to get started on those homes while I complete my work on the Agreement with Land Use and Public Works. The Agreement will reflect that the 2 permits were released, and the remainder of the permits will be tied to specific work in the field.
>
> Please let me know when someone will be applying for those 2 permits, so I can alert staff not to withhold approval for open space issues.[13]

Hyetts continued work on the Open Space and continued to communicate with Smith. The County granted the two promised permits on September 19 and September 20.[14]

---

[13] *Id.* at 1.

[14] In its complaint, Hyetts alleged that the County promised, but failed to deliver, one of the two promised permits, in what Hyetts refers to as the "[Two] Permit Promise." Compl. ¶ 31. In its opening brief in support of the Motion, the County submitted documents showing that, in fact, both permits were granted and the lots in question currently contain residential homes. *See* D.I. 15 at 10–11; *id.* Ex. A. Hyetts stood by its position in its answering brief, reciting its allegation that the second promised permit had not been released. *See* D.I. 17 at 8–9 (citing Compl. ¶ 31); *see also id.* at 9, 14 (arguing Hyetts is entitled to the previously defined "Unreleased Permit" based on the Two Permit Promise). At argument, Hyetts abandoned that position, conceding that the Two Permit Promise is a "dead issue" and that "[t]his case is solely about the completion agreement." Hr'g Tr. 42:14–43:8. Given this concession, I accept the County's representation as true and disregard the incorrect representation in Hyetts's complaint, as well as the arguments that flow from it.

The parties never reached a formal Completion Agreement. But Hyetts alleges that in an October 2 email to Schultz, Smith laid out the "essential terms" of a potential Completion Agreement (the "October 2 Email"). The Complaint does not describe or attach those terms, though it repeatedly references them. The County attached the October 2 Email to its opening brief. It states, in its entirety:

Kurt,

Thanks to you, Ramesh Batta and your CCR for meeting with us last Friday. Yesterday afternoon, I spoke with Ramesh about the site visit and the status of permits for new single-family dwellings. He appears to have misunderstood me when he thought that the county was amenable to releasing two more permits. Rather, the two permits he referenced are the same ones that were issued last week at your request. Following the site inspection, we feel that the two permits that were recently issued account for everything that was done since the July inspection. Now, areas need to be completed before additional permits will be released.

While a few items here and there were finished, the open space team noted that no portion of the open space is currently in a passable condition at this time. For example:

- there is still sediment, erosion, weeds and/or incorrectly sized rock in most of the bioretention areas and stormwater facilities, and no new mulch has been added to any of the bioretention areas
- there is a considerable amount of dead landscaping throughout the subdivision
- seed tickets for the dry pond have not been received
- revised engineering plans and/or answers have not been received to explain the discrepancies with the existing facilities
- as-builts have not been received, and the pool elevation of the wet pond is currently being studied

With only a half dozen permits remaining, areas need to be completed before more permits can be considered. Please refer to the July inspection report and work toward completing entire subcategories before requesting additional inspections or permits. The county should be assessing inspection fees each time the open space team is assembled onsite. That has not occurred to-date, but Public Works is questioning why Land Use is scheduling inspections when stormwater facilities are not in a passable condition.

***If I were to craft a new Completion Agreement, it would have to be something generic along the lines of:***
- Resolve all issues with wet pond #2 to the satisfaction of Public Works — 2 permits
- Complete all items under Dry Pond #1 and replace all missing or dead landscaping— 1 permit
- Complete Bioretention Areas 141A, 141B, 141D, 141E to the satisfaction of Public Works — 1 permit
- Submit approvable as-builts, revised engineering plans and pass a final open space inspection — 2 permits

Regards,

Jim[15]

Hyetts argues the last set of four bullet points constitute the "essential terms" of a

Completion Agreement, such that the parties struck a definitive and enforceable

agreement to agree.[16]

---

[15] D.I. 13, Ex. B (emphasis added); *see also* Compl. ¶ 34 (referencing October 2 Email).

[16] *E.g.*, Compl. ¶ 34.

The Complaint does not allege how, if at all, Hyetts responded to the October 2 Email. It does allege that "[b]y 2020, Hyetts completed enough work items in the [October 2 Email] to be entitled to" four of the six outstanding permits.[17] While Hyetts's counsel and Smith continued to communicate, the parties did not reach a Completion Agreement. Hyetts continued to improve the Open Space, and County inspectors continued to find more issues. Hyetts alleges the delayed Completion Agreement has caused it considerable expense, in both actual costs and because it could not meet its loan financing obligations due to the delay in selling the Undeveloped Lots.

Hyetts filed its Verified Complaint (the "Complaint") on November 3, 2020, over a year after the October 2 Email.[18] Count I alleges breach of contract and seeks specific performance of the County's alleged promises. Count II is for promissory estoppel; Count III is for equitable estoppel. Count IV seeks a declaration affirming Hyetts's view of the County's emails. The parties reached a stipulation to extend the County's deadline to respond, and the County filed its motion to dismiss (the

---

[17] *Id.* ¶ 35; *see also id.* ¶ 42 (alleging it was Hyetts's position "that it had achieved substantial completion of the [October 2 Email's terms]").

[18] *See generally id.*

"Motion") on December 8.[19] Hyetts responded with a motion for default judgment on December 10, which it withdrew on January 12, 2021.[20] The parties fully briefed the Motion and the Court heard oral argument on July 1.[21]

## II.    ANALYSIS

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[22]

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[23] This standard is "minimal"[24] and "plaintiff-friendly."[25] "Indeed,

---

[19] D.I. 4; D.I. 6.

[20] D.I. 8; D.I. 12.

[21] D.I. 24; *see also* Hr'g Tr.

[22] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted); *accord In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *5 (Del. Ch. Oct. 27, 2020).

[23] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[24] *Id.* at 536 (citing *Savor*, 812 A.2d at 896).

[25] *See, e.g.*, *Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *9 (Del. Ch. July 24, 2009).

it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[26]  Despite this forgiving standard, the Court need not "accept conclusory allegations unsupported by specific facts" or "draw unreasonable inferences in favor of the non-moving party."[27]  "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[28]

Hyetts's claims are all variations on the same theme:  that the County made enforceable promises to either enter a Completion Agreement on certain terms or issue certain building permits.  I conclude Hyetts has failed to plead that any of Smith's emails constitute such a promise, and Hyetts cannot obtain relief against the County under its estoppel theories.

> **A.    The Complaint Fails To State A Claim For Breach Of Contract.**

Count I contends that the County breached its agreement to "execute a Completion Agreement containing the [terms in the October 2 Email]," and release

---

[26] *Cent. Mortg. Co.*, 27 A.3d at 536.

[27] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[28] *Trados*, 2009 WL 2225958, at *4 (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

four of the permits allegedly promised in that email.[29]  In briefing, Hyetts clarified

that it does not allege a breach of any actual Completion Agreement because the

parties never agreed to one.[30]  Hyetts now takes the position that some combination

of the October 2 Email, the Code, and the Landscape Plan constitute an agreement

to agree to a Completion Agreement.[31]  Hyetts has failed to show the existence of

such a contract, and so, its breach of contract claim must be dismissed.

To state a viable breach of contract claim, a plaintiff must allege a (1) a

contractual obligation; (2) a breach of that obligation by the defendant; and (3) a

resulting damage to the plaintiff.[32]  The plaintiff must allege a valid contract with

three elements from *Osborn ex rel. Osborn v. Kemp*:  "(1) the parties intended that

the contract would bind them, (2) the terms of the contract are sufficiently definite,

and (3) the parties exchange legal consideration."[33]

---

[29] Compl. ¶ 57.

[30] D.I. 17 at 17.

[31] *Id.* at 17–18.  Hyetts also mentions another article of the New Castle County Code relating to drainage.  *Id.*

[32] *E.g.*, *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) (citing *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1995 WL 662685, at *7 (Del. Ch. Nov. 2, 1995)).

[33] 991 A.2d 1153, 1158 (Del. 2010); *see also Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1229–38 (Del. 2018) (discussing *Osborn*).

The parties have focused on the October 2 Email, disagreeing about whether its bullet points were "sufficiently definite" under the second *Osborn* prong, or specified all "material and essential terms" as required for an agreement to agree.[34] But the "critical [question] is whether the parties reached an agreement *to be bound* with respect to those material terms.  The distinction is vital."[35]  Neither side

---

[34] *See* 991 A.2d at 1158; *Pharmathene, Inc. v. Siga Techs., Inc.*, 2008 WL 151855, at *13 (Del. Ch. Jan. 16, 2008) ("Under Delaware law, parties may make agreements to make a contract and such an agreement will be enforced if the agreement specifies all of the material and essential terms including those to be incorporated in the future contract." (internal quotation marks omitted) (quoting *Vale v. Atl. Coast & Inland Corp.*, 99 A.2d 396, 399 (Del. Ch. 1953))).

[35] *VS&A Commc'ns P'rs, L.P. v. Palmer Broad. Ltd. P'ship*, 1992 WL 339377, at *10 (Del. Ch. Nov. 16, 1992).

Even following Hyetts down its suggested path, its argument fares no better.  "[A] contract must contain all material terms in order to be enforceable.  If terms are left open or uncertain, this tends to demonstrate that an offer and acceptance did not occur." *Ramone v. Lang*, 2006 WL 905347, at *11 (Del. Ch. Apr. 3, 2006); *see Eagle Force*, 187 A.3d at 1230 ("We also said in *Osborn* that a contract must contain all material terms in order to be enforceable.  Chancellor Allen similarly observed in [*Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1102 (Del. Ch. 1986)] that, until it is reasonable to conclude, in light of all of the surrounding circumstances, that all of the points that the parties themselves regard as essential have been expressly or (through prior practice or commercial custom) implicitly resolved, the parties have not finished their negotiations and have not formed a contract." (footnotes, alterations, and internal quotation marks omitted)).  The four bullet points from the October 2 Email Hyetts argues include the "essential terms" are vague and subject to conditions, including approval from other bodies, like the Public Works department.  *See* D.I. 15 Ex. B.  They are insufficiently definite as to form the basis of a contract.  These already-vague descriptions are made no clearer by the issues outlined in the first set of five bullet points.  Those issues, expressly qualified as examples, are not the exhaustive list of all material or essential terms.  Smith goes on to refer Schultz to a "July inspection report" for a more thorough explanation of those issues.  *Id.*  It is clear that the October 2 Email was advancing the parties' negotiations, not resolving all essential terms.

manifested an intent to be bound by the terms in the October 2 Email, and so, the

parties never formed a contract in the first instance.

Under Delaware law, "the formation of a contract requires a bargain in which

there is a manifestation of mutual assent to the exchange and a consideration."[36]  A

valid contract exists only if "the parties have manifested mutual assent to be bound

by that bargain."[37]  "[M]anifestation of mutual assent is an external or objective

standard for interpreting conduct."[38]  A party "manifests an intention [to be bound]

---

Importing terms from the Code or the Landscaping Plan does not make the October 2 Email any more definite.  Neither the Complaint nor the briefs detail the Landscaping Plan's terms.  Despite arguing that those and other agreements provide "further essential terms of the Completion Agreement," Hyetts has not alleged any breach of the LDIA or Landscaping Plan, or any violation of the Code.  *See* D.I. 17 at 18.

The absence of definite material terms is what appears to be motivating Hyetts's case.  Hyetts seeks a definite and final "checklist" to obtain the final permits, and contends the County has been evasive to date.  *See* Compl. ¶ 49 ("Hyetts needs to have a certain, specific, final list of outstanding items to complete the [Open Space].  That can only be accomplished pursuant to a written Completion Agreement with the Department [of Land Use].").  The fact that Hyetts still needs a Completion Agreement shows that whatever terms to which the parties already agreed or raised in negotiations are insufficient to form a contract.

[36] *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017) (quoting *Wood v. State,* 2003 WL 168455, at *2 (Del. Jan. 23, 2003) (ORDER)).

[37] *Id.* (citing *Osborn*, 991 A.2d at 1158).

[38] *Chemours Co. v. DowDuPont Inc.*, 2020 WL 1527783, at *10 n.130 (Del. Ch. Mar. 30, 2020) (internal quotation marks omitted) (quoting Restatement (Second) of Contracts § 2 cmt. b (1981)).

if he believes or has reason to believe that the promisee will infer that intention from his words or conduct."[39]  The "relevant inquiry" is

> whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that agreement concluded the negotiations.[40]

The Court determines whether there has been mutual assent "based upon [the parties'] expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent."[41]

Parties often express their intent to be bound by making an offer and accepting that offer.[42]  An offer is the "signification by one person to another of his willingness to enter into a contract with him on the terms specified in the offer."[43]  But a "mere

---

[39] Restatement (Second) of Contracts § 2 cmt. b (1981).

[40] *Innoviva*, 2017 WL 6209597, at *21 (quoting *Leeds*, 521 A.2d at 1097); *see also* Restatement (Second) of Contracts § 2 (1981) ("The phrase 'manifestation of intention' adopts an external or objective standard for interpreting conduct; it means the external expression of intention as distinguished from undisclosed intention.").

[41] *Innoviva*, 2017 WL 6209597, at *21 (alterations omitted) (quoting *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986)).

[42] Restatement (Second) of Contracts § 22(1) (1981) ("The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties.")

[43] *Loveman v. Nusmile, Inc.*, 2009 WL 847655, at *3 (Del. Super. Mar. 31, 2009) (internal quotation marks omitted) (quoting *Salisbury v. Credit Serv., Inc.*, 199 A. 674, 681 (Del. Super. 1937)).

statement of a person's willingness to enter negotiations with another person is in no sense an offer, and cannot be accepted so as to form a binding contract."[44] And the offeree must unconditionally accept the offer on identical terms.[45]

Hyetts and the County never reached an agreement to agree to a Completion Agreement because the County never manifested an intent to be bound. The October 2 Email clearly shows the County, through Smith, lacked an intent to be bound by any particular terms. The final four bullet points, which Hyetts has seized on as showing all "essential terms," are preceded by a glaring qualification: "***If I were to craft*** a new Completion Agreement, it would have to be something generic ***along the lines of*** . . . ."[46] Smith's bullet points were not an offer Hyetts could accept—never mind an agreement to agree to a Completion Agreement—but rather, rough terms for a hypothetical new Completion Agreement the County would be willing to consider. Smith's "mere statement of [his] willingness to enter negotiations with

---

[44] *Salisbury*, 199 A. at 681.

[45] *See Gomes v. Karnell*, 2016 WL 7010912, at *3 (Del. Ch. Nov. 30, 2016) ("An acceptance must include three general components: (i) an expression of commitment; (ii) the commitment must not be conditional on any further act by either party; and (iii) the commitment must be one on the terms proposed by the offer without the slightest variation." (internal quotation marks omitted) (quoting *Ramone*, 2006 WL 905347, at *11)).

[46] D.I. 15, Ex. B (emphasis added).

[Hyetts]" is not an offer.[47]  A reasonable negotiator in Hyetts's position could not have believed the October 2 Email "concluded the negotiations" between the parties.[48]  Because there was no "complete meeting of the minds" between Hyetts and the County on these points, no contract was formed between them.[49]

Lacking these basic elements of contract formation, Hyetts fails to plead the first element of a breach of contract claim:  the existence of a contract.  The Motion is granted with respect to Count I.

### B.    The Complaint Fails To State Estoppel Claims.

Counts II and III assert nearly identical claims for promissory estoppel and equitable estoppel, respectively.[50]  Both invoke the same statements by Smith, each

---

[47] *See Salisbury*, 199 A. at 681.

[48] *See Innoviva*, 2017 WL 6209597, at *21 (quoting *Leeds*, 521 A.2d at 1097).

[49]  *See United Health All., LLC v. United Med., LLC*, 2013 WL 6383026, at *6 (Del. Ch. Nov. 27, 2013).

[50] *Compare* Compl. ¶¶ 61–64, *with id.* ¶¶ 65–69.  Their similarities are likely intentional, given the substantial overlap between promissory and equitable estoppel. *E.g.*, *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 87 (Del. 1998) ("To succeed on a claim for promissory estoppel, plaintiff must prove that defendant made a promise with the intent to induce action or forbearance, that plaintiff actually relied on the promise, and that he suffered an injury as a result.  Equitable estoppel is based on similar principles.  To make out a claim of equitable estoppel, plaintiff must show that he was induced to rely detrimentally on defendant's conduct. (footnote omitted)); *see Territory of U.S. V.I. v. Goldman, Sachs & Co.*, 937 A.2d 760, 804–05 (Del. Ch. 2007) (citing *VonFeldt*, 714 A.2d at 87), *aff'd*, 956 A.2d 32 (Del. 2008) (TABLE); *see also Reeder v. Sanford Sch., Inc.*, 397 A.2d 139, 142 (Del. Super. 1979) ("Whether Beach's alleged statement is viewed as a misrepresentation

of which the Complaint defines as a "Promise," and argue that Promise induced the same Hyetts conduct.[51] I conclude neither claim is reasonably conceivable.

### 1. Promissory Estoppel

In Count II, Hyetts alleges that Smith promised to provide Hyetts with a Completion Agreement in the "Completion Agreement Promise," but did not perform.[52] Hyetts further alleges that it continued to work on the Open Space in reliance on that promise, and so, it has a claim for promissory estoppel. Hyetts seeks an order compelling the County to "enter into a Completion Agreement containing the [terms outlined in the October 2 Email]" and to release the allegedly promised permits.[53]

> A promissory estoppel claim requires allegations that:
>
> (1) a promise was made; (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (3) the promisee reasonably relied on the promise and took action to his detriment; and (4) such promise is binding because injustice can be avoided only by enforcement of the promise.[54]

---

of present fact, equitable estoppel or a 'promise' as to future conduct, promissory estoppel, a jury question is raised.").

[51] *Compare* Compl. ¶¶ 61–64, *with id.* ¶¶ 65–69.

[52] *See, e.g., id.* ¶¶ 26, 62.

[53] *Id.* ¶ 64.

[54] *Grunstein v. Silva*, 2009 WL 4698541, at *7 (Del. Ch. Dec. 8, 2009) (citing *Phamathene*, 2008 WL 151855, at *17, and then citing *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000)).

Promissory estoppel requires "a real promise, not just mere expressions of expectation, opinion, or assumption."[55] Such a promise must be "reasonably definite and certain."[56]

Hyetts's promissory estoppel claim is unavailable against the County, a government body. In *Port Penn Hunting Lodge Association v. Meyer*, this Court held "[t]he Delaware Supreme Court has foreclosed promissory estoppel claims against government entities except in limited circumstances, such as employment."[57] Hyetts does not assert this case falls within any exception to the general prohibition; instead, it attempts to narrow that general prohibition by distinguishing the Maryland case the Delaware Supreme Court cited when it first announced the rule.[58] That case aside, our Supreme Court has since reinforced Delaware's broad rule, including by

---

[55] *James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, 2009 WL 1638634, at *5 (Del. Ch. June 11, 2009) (internal quotation marks omitted) (quoting *Addy v. Piedmonte*, 2009 WL 707641, at *22 (Del. Ch. Mar. 18, 2009)).

[56] *Id.*

[57] 2019 WL 2077600, at *9 (Del. Ch. May 9, 2019) (citing *Harmon v. State*, 62 A.3d 1198, 1201 (Del. 2013) ("As a general rule, however, the state is not estopped in the exercise of its governmental functions by the acts of its officers." (internal quotation marks omitted) (quoting *McCoy v. State*, 277 A.2d 675, 676 (Del. 1971)))), *aff'd*, 222 A.3d 1044 (Del. 2019) (TABLE).

[58] *See* D.I. 17 at 22 (discussing *Comptroller of Treasury v. Atlas Gen. Indus.*, 198 A.2d 86 (Md. 1964)).

summarily affirming *Port Penn*.[59]  I conclude that Hyetts cannot obtain relief from the County under a promissory estoppel theory.

Hyetts also fails to plead that theory, having failed to allege a sufficiently definite and certain promise.  As explained in Count I, Smith's musings in the October 2 Email are insufficiently definite and certain to serve as a real promise for the purposes of a promissory estoppel claim.  Smith's conditional language could not reasonably be understood as a promise the County would enter into a Completion Agreement on those terms; rather, he was negotiating or expressing the County's bargaining position—in other words, his "expectation [or] opinion" as to what a final agreement ought to include.[60]  Nor can Smith's September 12 email, which Hyetts labels the "Completion Agreement Promise," support a promissory estoppel claim. It contains no definite and certain promise to enter into a Completion Agreement on any particular terms.  It states, in relevant part:  "I plan to have the Completion Agreement done tomorrow, after which I will review it with Public Works and forward to you for execution next week."[61]  This is a statement of expectation, not a definite and certain promise to execute a Completion Agreement by a particular date.

---

[59] 222 A.3d 1044.

[60] *See James Cable*, 2009 WL 1638634, at *5.

[61] Compl. Ex. 3 at 1.

Smith's later apologetic statement, of "I promised you that I would have the Agreement ready for your group to execute this week," does not change how a reasonable person would have viewed his original message.[62] Moreover, the "Completion Agreement Promise" was conditioned on review from the Department of Public Works; an offer conditioned on yet-unreceived approval from a third party is not sufficiently definite and certain to state a claim for promissory estoppel.[63] Hyetts's failure to allege a real promise is fatal to its claim.[64]

The Motion is granted with respect to Count II.

### 2. Equitable Estoppel

Count III is for equitable estoppel, and similarly seeks an order requiring the County to enter a Completion Agreement with the terms from the October 2 Email and to compel the release of the purportedly promised permits.[65] Equitable estoppel is an awkward fit for Hyetts's claim in Count III, which repeatedly alleges Hyetts detrimentally relied on Smith's two "Promise[s]."[66] Having concluded these were

---

[62] *See* Compl. Ex. 4 at 1.

[63] *See Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 877 (Del. 2020), *aff'g*, 2019 WL 4733430 (Del. Super. Sept. 27, 2019).

[64] See *Metro. Convoy Corp. v. Chrysler Corp.*, 208 A.2d 519, 521 (Del. 1965).

[65] Compl. ¶ 69.

[66] *See id.* ¶¶ 66 ("The Completion Agreement Promise regarding the [Open Space] was made by the County to Hyetts. In addition, the 2 Permit Promise was made by the County

not promises, I consider whether those statements and Hyetts's reactions can support an equitable estoppel claim.

To state a claim for equitable estoppel, Hyetts must plead the following elements:

> (1) conduct by the party to be estopped that amounts to a false representation, concealment of material facts, or that is calculated to convey an impression different from, and inconsistent with that which the party subsequently attempts to assert, (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of discovering the truth, (3) the intention or expectation that the conduct shall be acted upon by, or influence, the other party and good faith reliance by the other, and (4) action or forbearance by the other party amounting to a change of status to his detriment.[67]

---

to Hyetts."), 67 ("The Completion Agreement Promise and the 2 Permit Promise led Hyetts to change its position in reliance thereon . . ."), 68 ("Hyetts suffered a detriment in the form of extensive costs in performing the work that it completed based upon the Completion Agreement Promise and the 2 Permit Promise.").

[67] *Olson v. Halvorsen*, 2009 WL 1317148, at *11 (Del. Ch. May 13, 2009) (internal quotation marks omitted) (quoting *Cornerstone Brands, Inc. v. O'Steen*, 2006 WL 2788414, at *3 n.12 (Del. Ch. Sept. 20, 2006)), *aff'd*, 986 A.2d 1150 (Del. 2009); *see also Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch. 2005) ("The doctrine of equitable estoppel is invoked when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment. The party claiming estoppel must demonstrate that: (i) they lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) they reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) they suffered a prejudicial change of position as a result of their reliance." (footnotes and internal quotation marks omitted) (citing *Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903–04 (Del. 1965), then citing *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990), and then citing *Monterey Inv., Inc. v. Healthcare Prop.*, 1997 WL 367038, at *5 (Del. Ch. June 26, 1997))), *aff'd*, 884 A.2d 512 (Del. 2005).

A party's "reliance must be both reasonable and justified under the circumstances. Thus, the standards for establishing the elements of equitable estoppel are stringent; the doctrine is applied cautiously and only to prevent manifest injustice."[68]

Like promissory estoppel, "[a]pplication of the doctrine of equitable estoppel to governmental actions is rare. Generally, courts will not depart from their traditional cautiousness in applying the doctrine unless there are exceptional circumstances which make it *highly* inequitable or oppressive to enforce the regulations."[69] Considering the typical estoppel claim by a land developer against the government, in the zoning context,[70] then-Vice Chancellor Montgomery-Reeves elaborated on this point:

---

[68] *Pilot Point Owners Ass'n v. Bonk*, 2008 WL 401127, at *2 (Del. Ch. Feb. 13, 2008) (footnote omitted) (citing *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *6 (Del. Ch. July 9, 2002)).

[69] *Salem Church (Del.) Assocs. v. New Castle Cty.*, 2006 WL 4782453, at *12 (Del. Ch. Oct. 6, 2006) (footnotes and internal quotation marks omitted) (quoting *Miller v. Bd. of Adjustment of Dewey Beach*, 521 A.2d 642, 646 (Del. Super. 1986)).

[70] *Port Penn*, 2019 WL 2077600, at *8–10.

> The doctrine of equitable estoppel has traditionally not been favored when sought to be applied against a government entity, but it is accepted that in certain circumstances estoppel may be raised to prevent the municipality from enforcing existing zoning codes. Parties may use equitable estoppel as a defense against the enforcement of a zoning regulation where: (1) a party, acting in good faith, (2) on affirmative acts of a municipal corporation, (3) makes expensive and permanent improvements in reliance thereon, and (4) the equities strongly favor the party seeking to invoke the doctrine.[71]

Cases preceding *Port Penn* similarly require substantial reliance on affirmative acts and equities that sharply favor the claimant.[72]

---

[71] *Id.* at *10 (footnotes, alterations, and internal quotation marks omitted) (quoting *Dragon Run Farms, Inc. v. Bd. of Adjustment of New Castle Cty.*, 1988 WL 90551, at *3 (Del. Super. Aug. 11, 1988), and then quoting *Acierno v. New Castle Cty.*, 2000 WL 718346, at *9 (D. Del. May 23, 2000)), *aff'd*, 222 A.3d 1044 (Del. 2019) (TABLE).

[72] *E.g.*, *Salem Church*, 2006 WL 4782453, at *12 ("In the context of land development, Delaware courts have also recognized equitable estoppel claims where (1) a party, acting in good faith, upon some act or omission of the government, and (2) makes a substantial change of position or incurs extensive obligations and expenses, and (3) it would be highly inequitable or unjust to impair or destroy rights that the landowner has acquired." (citing *DiSabatino v. New Castle Cty.*, 781 A.2d 698, 702 (Del. Ch. 2000), *aff'd*, 781 A.2d 687 (Del. 2001), then citing, *Wilm. Mat'ls, Inc. v. Town of Middletown*, 1988 WL 135507, at *6 (Del. Ch. Dec. 16, 1988), and then citing *Miller*, 521 A.2d at 645–46); *E. Shore Env't., Inc. v. Kent Cty. Dep't of Plan.*, 2002 WL 244690, at *4 (Del. Ch. Feb. 1, 2002) ("An equitable estoppel claim arises where (i) a party that is acting in good faith (ii) relies on affirmative acts or representations of the government (iii) by making substantial improvements to property, and (iv) it would be inequitable to allow the government to impair or destroy the rights the property owner has thereby acquired." (citing *Miller*, 521 A.2d at 645–46, then citing *Disabatino*, 781 A.2d at 702, and then citing *Motiva Enters. LLC v. Sec'y of Dep't of Nat. Res. & Env't Control*, 745 A.2d 234, 250 (Del. Super. 1999))). Then-Vice Chancellor Noble, who wrote the Court's opinion in *Salem Church*, recited the rule from *Eastern Shore Environmental* in *In re Kent Cty. Adequate Pub. Facilities Ordinances Litig.*, 2009 WL 445386, at *8 (Del. Ch. Feb. 11, 2009), on which Hyetts relies.

Several deficiencies preclude Hyetts's equitable estoppel claim. For one, Hyetts's continued maintenance in the Open Space in 2020, including "cutting grass, weeding, clearing, cleaning, and otherwise maintaining and repairing the [Open Space]" is far short of the "expensive and permanent improvements" required.[73] There is no allegation that this upkeep was permanent, nor has Hyetts alleged its cost.[74] And Hyetts alleges it has simply been continuing to maintain the Open Space, not that it has changed its position as required for an equitable estoppel claim.[75] Finally, the Complaint offers no basis to infer that ordering the County to enter into a Completion Agreement with Hyetts on the terms in the October 2 Email is necessary to avoid the rare case of "manifest injustice" or "highly inequitable or

---

[73] Compl. ¶ 44; *Port Penn*, 2019 WL 2077600, at *9; *see also Salem Church*, 2006 WL 4782453, at *12; *Kent Cty.*, 2009 WL 445386, at *8.

[74] *See Port Penn*, 2019 WL 2077600, at *10 ("Port Penn appears to refer to lost profits or land costs. Neither Port Penn's time, nor its unspecified thousands of dollars in costs and engineering, nor its lost profits from not being able to develop over 200 lots, is sufficient to plead expensive and permanent improvements in reliance. Port Penn has not pled any dollar amounts at all. Port Penn has also not pled that it made permanent improvements. Port Penn's equitable estoppel claim fails to assert a conceivable claim.").

[75] *See Motiva Enters. LLC v. Sec'y of Dep't of Nat. Res. & Env't Control*, 745 A.2d 234, 250 (Del. Super. 1999) ("For the doctrine [of equitable estoppel] to apply, there must have been a substantial change in circumstance based on a good faith reliance upon another's act." (alterations and internal quotation marks omitted) (quoting *Raley v. State*, 604 A.2d 418 (Del. 1991)).

oppressive" results.[76]  Hyetts offers no response to these deficiencies, other than to say that engaging with these questions is premature at the motion to dismiss stage.[77]

The Motion is granted with respect to Count III.

### C.     Hyetts Is Not Entitled To A Declaratory Judgment.

In Count IV, Hyetts seeks a declaration confirming its view of Smith's emails as enforceable promises.  As Hyetts conceded at oral argument, its declaratory judgment claim is dependent on its other claims.[78]  Because those claims are not well-pled, the Motion is granted with respect to Count IV.

### III.   CONCLUSION

For the foregoing reasons, the Motion is **GRANTED**.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc: All Counsel of Record, via *File & ServeXpress*

---

[76] *See Pilot Point*, 2008 WL 401127, at *2; *Salem Church*, 2006 WL 4782453, at *12.

[77] *See* D.I. 17 at 28.

[78] *See* Hr'g Tr. 58:7–10.